[No. 6070–1–II.  Division Two.  August 14, 1984.]

BURLEY LAGOON IMPROVEMENT ASSOCIATION, *Appellant*, v.
PIERCE COUNTY, ET AL, *Respondents*.

*Philip M. Best,* for appellant.

*William H. Griffies, Prosecuting Attorney, Keith M. Black, Deputy,* and *Keith D. McGoffin,* for respondents.

PETRIE, J.—On appeal, plaintiff, Burley Lagoon Improvement Association, contends that the trial court erroneously dismissed its application for writ of review of defendant Pierce County Commissioners' resolution, dated October 14, 1980, granting defendant Royal Land, Inc., preliminary site plan approval for a shopping center to be known as Holly Tides. Burley Lagoon contends that the County Commissioners erred because (1) Royal Land had not fulfilled the requirements of the grandfather clause of the County's 1975 zoning regulations and thus had not acquired the right to develop the site under prior zoning regulations; (2) the environmental impact statement (EIS) for the Holly Tides Shopping Center was inadequate; and (3) the decision of the Pierce County Commissioners to grant preliminary site plan approval was arbitrary and capricious. Our resolution of the first issue is dispositive and requires reversal.

In 1968, at the request of Royal Land's predecessors who desired to construct a shopping center, the Pierce County Board of Commissioners rezoned the property here in issue

from general use to a special PS–2. This zone permitted development of a planned community shopping center on the Holly Tides site. The record does not reflect any further action toward development of the site until May 22, 1976 when Royal Land submitted a site plan for approval, completed a SEPA environmental checklist, and made application with the county health department for a sewage disposal permit.

In the meantime, in 1975 the County Commissioners adopted *Peninsula Comprehensive Plan and Regulations* effective June 30, 1975. This plan and the implementing regulations repealed all previous zoning classifications, but expressly preserved intact existing PS–2 zones for an additional 2 years if a "use" or "development" of the special zone has been commenced within that time. This transitional "grandfathering" was permitted and limited by section 9.140.030(2)(b) of the regulations as follows:

> *Where a special zone,* unclassified use permit or conditional use permit or permit to enlarge, alter or expand a nonconforming use *has been granted* pursuant to the Pierce County Zoning Code *and no development or use has been commenced* as of the effective date of this Regulation or *within two years after the effective date of this Regulation, the provisions of the prior authority shall automatically cease and shall be null and void.* Thereafter, the use of the land precisely (and previously) described as a part of the special zone, unclassified or conditional use permit shall be subject to the provisions of this Regulation.

(Italics ours.)

We consider first whether Royal Land met the requirements articulated in section (2)(b) of the grandfather clause and thereby acquired the right to develop the Holly Tides site as a shopping center under the prior PS–2 zone.

■ We pause briefly to analyze the nature of our task. The interpretation of a zoning ordinance is a question of law for the court. *Mercer Island v. Kaltenbach,* 60 Wn.2d 105, 371 P.2d 1009 (1962). In interpreting statutes and ordinances, definitions contained within an act control the

meaning of words used in that act. *North Pac. Coast Freight Bur. v. State,* 12 Wn.2d 563, 122 P.2d 467 (1942). Where the language of a statute is clear, the meaning of a statute will be discovered from the wording in the statute. *State v. Houck,* 32 Wn.2d 681, 203 P.2d 693 (1949); *Shelton Hotel Co. v. Bates,* 4 Wn.2d 498, 104 P.2d 478 (1940). Courts must construe ordinances and laws in accord with their purpose. *State ex rel. Spokane United Rys. v. Department of Pub. Serv.,* 191 Wash. 595, 71 P.2d 661 (1937).

Section (2)(b) of the grandfather clause is a transitional, limited vesting provision. Therefore, we must consider the typical purpose of such rules: Common law vesting rules protect individuals who have taken substantial steps to develop their property in reliance on prior zoning regulations when zoning is changed before development of their property is completed. 8 E. McQuillin, *Municipal Corporations* § 25.157 (3d ed. 1983); *Allenbach v. Tukwila,* 101 Wn.2d 193, 676 P.2d 473 (1984); *Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958).

Section (2)(b) of the grandfather clause reflects the estoppel approach of the common law vesting rule recognized in most United States jurisdictions.[1] Under the

---

[1]The transitional vesting provisions articulated in the grandfather clause differ from the common law vesting rule recognized in Washington. However, it appears that counties have independent constitutional authority to enact ordinances which diverge from the common law. Article 11, section 11 of the Washington Constitution accords counties and municipalities plenary power to enact regulations for the general welfare. Const. art. 11, § 11 provides: "Police and Sanitary Regulations. Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." Pierce County's transitional vesting clause was enacted as a matter of grace to preserve existing zones for a limited time. We do not view it as being in conflict with any general law.

*Hull v. Hunt, supra,* implicitly recognized that municipal vesting regulations may vary from Washington's common law vesting rule. In addressing the question of whether Washington's vesting rule would lead to speculation in building permits, the Supreme Court reasoned that more restrictive local vesting ordinances, which typically require builders to commence development within a set time period, would prevent such a problem from arising.

majority estoppel rule, the vested right to develop land under prior zoning codes is not established until the developer has *substantially changed his position in reliance on the issuance of a building permit or on the application for such a permit.*[2] *Hull v. Hunt, supra; Allenbach v. Tukwila, supra.* 8 E. McQuillin, *Municipal Corporations* §§ 25.156–25.157 (3d ed. 1983). Section (2)(b) similarly requires an individual desiring to develop his land under a prior special zone to use or develop his land substantially within 2 years of the effective date of the 1975 regulations.

To interpret section (2)(b) of the grandfather clause, therefore, we examine the provisions of 9.140.030(2)(b) in conjunction with the definitions of the terms "use" and "development" contained within the regulations. Section 9.150.300 of the regulation defines the terms "use" and "development" as follows:

*Development.* "Development" or "use" shall mean:

(1) Any activity,[3] other than a normal agricultural activity[,] which materially affects the existing condition of land or improvements, such as:

(a) Clear cutting of trees within one–hundred feet of the Natural or Conservancy–Historic Environments or clear cutting of trees within one–hundred feet of any State road right–of–way or County arterial right–of–way or substantial removal of natural ground cover;

(b) Substantial excavation or deposit of earth or other fill, including alteration in the banks of any river or other

---

[2]Washington, as a matter of administrative convenience, has adopted the minority common law vesting rule. Washington's rule provides a "bright line" standard for vesting: The right to develop property under a particular zoning code vests upon application for a building permit. *See Allenbach v. Tukwila, supra.*

[3]We note that construing this ordinance in a sensible fashion requires us to read subsection (1) as though a comma follows the phrase "normal agricultural activity." Absent this comma, the phrase "which materially affects the existing condition of land or improvements" and the examples stated in provisions (a) through (e) would modify only the phrase "normal agricultural activities." This construction of the ordinance would defeat one of the objectives of subsection (1) which purports to exclude normal agricultural activities from the definition of development. Moreover, reading subsection (1) without the comma would render meaningless the words "Any activity" which preface subsection (1).

body of water (including streams designated in this Regulation);

(c) Construction, reconstruction or alteration of any improvement (except as permitted by these Regulations);

(d) Dumping or parking (which is a substantial or primary use) of any objects or materials whether mobile or immobile, liquid or solid;

(e) Commencement of any primary or substantial use of land or improvements and every change in its type or intensity.

(2) Any change in the legal relationships of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel or unit.

■■ Under those definitions, a mere application for site plan approval is not a use or development which triggers the vesting of an individual's right to develop land under a prior special zone. The five subdivisions of subsection (1) of 9.150.300 all illustrate an intent that *physical* activity to or upon the land or an existing improvement was contemplated as activity "which materially affects the existing condition of land or improvements." Included are such activities as (1) clear–cutting, (2) substantial removal of ground cover, (3) substantial excavation or substantial deposit of earth, or (4) activities constituting a substantial or primary use of land such as construction, reconstructions, dumping or parking. Though the specific terms of the definition are not necessarily all inclusive, we hold they do restrict the general term "any activity." *Dean v. McFarland,* 81 Wn.2d 215, 500 P.2d 1244 (1972). Additionally, a change in the *legal relationship* of persons to land such as a subdivision to facilitate separate transfer of title would also constitute a use or development of the land.

Application for a preliminary site approval, however, is neither a *physical activity* which impacts on the land nor a *change in the legal relationship* of persons to the land.

Because Royal Land did not, under the County's regulations, commence "development or use" of its site within 2 years of June 30, 1975, the PS–2 zoning of the site auto-

matically ceased on June 30, 1977.

■ Notwithstanding our interpretation of the County's transitional grandfather clause, Royal Land and Pierce County urge us to equate the vesting rights which flow from a party's filing a preliminary site plan for approval with a party's filing an application for a *building permit.* Thus, the argument continues, an applicant proceeding in good faith and diligence to procure the right to utilize property could not be precluded by bureaucratic delays and subsequent zoning changes, citing *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978).[4] Had the County intended to select that bright line of demarcation, it could have done so quite simply by incorporating such a filing into the conditions for preserving prior zoning classifications. As already noted, the County did not choose to include such a bright line method of preserving special zones in its transitional clause.

Furthermore, we know of no definitive case authority which purports to equate these two disparate filings. Indeed, processing a building permit is a ministerial act, whereas processing a preliminary site plan for approval is a discretionary act. Though a person filing a preliminary plat for approval may have a right to enforce statutorily imposed time limits placed on a decisionmaking entity, *Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 649 P.2d 103 (1982), such a right does not convert a discretionary act into a ministerial act. *Norco Constr., Inc. v. King Cy., supra.*

We hold that the PS–2 zone classification for the Holly Tides site automatically expired on June 30, 1977. Accordingly, under Pierce County's zoning ordinance, the County Commissioners had no authority to approve Royal Land's preliminary site plan on or after that date. The County's resolution of October 14, 1980 was, therefore, arbitrarily enacted.

---

[4]Royal Land does not, however, contend that the County should be estopped from denying site plan approval.

Judgment reversed with direction to quash the County's resolution granting site plan approval.

REED, J., and JOHNSON, J. Pro Tem., concur.

Reconsideration denied October 29, 1984.

Review denied by Supreme Court January 4, 1985.