[No. 15301–3–I.   Division One.   August 25, 1986.]

LINCOLN SHILOH ASSOCIATES, LTD., *Respondent*, v.
MUKILTEO WATER DISTRICT, *Appellant*.

124

*Michael P. Ruark* and *Breskin, Robbins & Merkel,* for appellant.

*James J. Ragen* and *Hillis, Cairncross, Clark & Martin, P.S.,* for respondent.

RINGOLD, J.—Lincoln Shiloh Associates Limited brought an action to recover a general facilities charge assessed against its housing development by the Mukilteo Water District. The trial court granted Lincoln judgment based on one of five theories presented at trial. The District appeals. Lincoln also assigns error to the trial court's conclusions of law,[1] and all five issues presented to the trial court are

---

[1]The District has assigned error to four of the trial court's findings of fact. In the District's brief, however, it does not argue that these findings lack evidentiary support. In *Group Health Coop. v. State Tax Comm'n,* 72 Wn.2d 422, 425, 433

therefore reargued on appeal. We reverse.

Lincoln is the owner–developer of a 208–unit apartment complex known as Shiloh Village located in Everett, Washington. Sometime before October 1980, Lincoln acquired an option on the property upon which it intended to develop Shiloh Village. Lincoln retained an engineering firm to assist in planning the water, sewer, and storm systems for Shiloh Village.

One of the engineers Lincoln hired was informed by the manager of the District that Lincoln would have to pay two charges to connect to the District's water system: (1) a meter connection charge; and (2) an area charge of 4 cents per square foot of the buildings to be constructed. The area charge was also known as a capital improvement fee, as provided for in Water District Resolution A–562 dated July 20, 1977.

This information was conveyed to Lincoln, which used the quoted charges to develop plans for Shiloh Village, determine its economic feasibility, and obtain financing. Lincoln calculated that the area charge would amount to $6,400.

Although Shiloh Village is located inside the boundaries of the district, it is served directly by an Everett water main. In order to bring water from the Everett water main to Shiloh Village, Lincoln had to construct a water main extension. Between October 1980 and January 1981 Lincoln developed detailed plans for the entire water distribution system, including the water main extension. Normally, water provided to Shiloh Village flows through no facilities owned by the District other than the water system con-

---

P.2d 201 (1967), the Supreme Court stated:

> [A]lthough appellant has assigned error to a number of the trial court's findings of fact, it does not contend such findings are lacking in evidentiary support. Rather, appellant contents itself with challenging the trial court's conclusions of law. Under these circumstances, and since the findings of fact are to a large measure predicated upon stipulated or undisputed facts, we in turn accept such findings as verities. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The same rule applies here.

structed by Lincoln.

Before constructing the water system for Shiloh Village, Lincoln applied to Everett for permission to tap into Everett's water main. On January 21, 1981, Lincoln submitted building permit applications to Everett, which were later approved. The same day, Lincoln sent plans for the water system to the District. Lincoln's engineers modified those plans in response to requests by the District.

On February 18, 1981, Lincoln submitted to the District an application for permission to extend the water main. As of that date, Lincoln had paid approximately $19,000 in fees related to the design of the project. On March 13, 1981, the District approved the water system plans and gave permission to construct the water main extension.

Partially in reliance on the charges specified by the District and its permission to construct the water main extension, Lincoln closed the purchase for the Shiloh Village property in late March 1981. In May 1981, Lincoln began construction on the water main extension, which ultimately cost $90,000.

On June 3, 1981, at a public meeting of the District Commissioners, the District adopted resolution A–717. That resolution created a general facilities charge and increased the charges for connecting to existing facilities. The new connection charge, based on the type and number of dwelling units rather than square footage, applied to all customers connecting to the District water system after June 3, 1981. When applied to Shiloh Village, the general facilities charge imposed a connection fee of $95,680, rather than the $6,400 area charge that applied before June 3, 1981.

On September 15, 1981, Lincoln applied to the District for water and paid under protest the increased charge. Lincoln filed suit on September 15, 1982, alleging five different theories to recover the fees paid. After a bench trial, the trial court concluded that Lincoln's "right to connect to the water system under connection requirements and regulations vested on February 18, 1981, when its application for permission to extend the water main was filed." The trial

court awarded Lincoln $89,280, representing the difference between the general facilities charge (GFC) Lincoln paid and the area charge payable on February 18, 1981.

## VESTED RIGHTS

Washington has adopted a minority rule governing building permit applications under which an applicant's rights vest at the time of application as long as the application is approved and the project conforms to codes and regulations existing at the time of the application. *Mercer Enters. v. Bremerton,* 93 Wn.2d 624, 627, 611 P.2d 1237 (1980); *Hull v. Hunt,* 53 Wn.2d 125, 130, 331 P.2d 856 (1958). "Under this doctrine, developers who file a timely and complete building permit application obtain a vested right to have their application processed according to the zoning and building ordinances in effect at the time of the application." *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 50, 720 P.2d 782 (1986). The District contends that this rule of law should not be extended to govern applications to build a water main extension. The District asserts that it had the absolute discretion to deny Lincoln's application. Because approval of a building permit is ministerial and not discretionary, the District argues that the building permit cases are distinguishable.

The Supreme Court has held:

A vested right, entitled to protection from legislation, must be something more than a *mere expectation* based upon an anticipated continuance of the existing law; *it must have become a title,* legal or equitable, *to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another.*

*Godfrey v. State,* 84 Wn.2d 959, 963, 530 P.2d 630 (1975). If in compliance with existing codes and ordinances, a building or use permit must issue as a matter of right. *State ex rel. Ogden v. Bellevue,* 45 Wn.2d 492, 495, 275 P.2d 899 (1954). Thus, in the context of building permits, an owner has more than a "mere expectation" and has a vested right to use the land in accordance with regulations at the time the application is made. *State ex rel. Ogden,* at 495. The trial court analogized to this doctrine in deter-

mining that Lincoln's right to connect to the water system vested on February 18, 1981, before the GFC went into effect.

The Supreme Court, however, has indicated that the vested rights doctrine does not pertain to plat applications. *Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 684–85, 649 P.2d 103 (1982). In *Burley Lagoon Imp. Ass'n v. Pierce Cy.,* 38 Wn. App. 534, 686 P.2d 503 (1984), *review denied,* 103 Wn.2d 1011 (1985), the court held that the vested rights doctrine applicable to building permits did not govern preliminary site plans filed with a county for approval. The court noted that processing a building permit is a ministerial act, whereas processing a preliminary site plan for approval is a discretionary act. *Burley Lagoon Imp. Ass'n,* at 540.

The time the trial court selected to vest Lincoln's rights was inappropriate, because the District could have refused to accept the application when it was made. While there are due process limits on the District's exercise of discretion, these limits do not convert a discretionary act into a ministerial act. *Burley Lagoon Imp. Ass'n,* at 540; *see Norco Constr., Inc.* Lincoln could not, with a writ of mandamus, force the District to approve the application as an individual may do with a building permit. *See State ex rel. Ogden,* at 495.

We also believe it is inappropriate to apply the vesting doctrine to fees. The building permit cases cited by Lincoln give an owner a vested right to build according to regulations which existed at the time of the permit application. *Mercer Enters.* Here Lincoln wishes to have the fees frozen at the time of application. Unless by valid contract, a municipal corporation should not be bound to a fee schedule for actions to be performed at a future time. The building permit cases are inapposite.

Lincoln is not being forced to use its land or build differently from that which Lincoln was able to do at the time its plans were approved by the District. Instead, the cost is increased. Lincoln had no more than an expectation that the connecting charges would remain at $6,400. There is no

vested right here to the connection fee remaining $6,400. *See Godfrey v. State, supra.*

### APPLICATION OF GFC

Lincoln contends that the District's GFC is unreasonable and discriminatory as applied to Shiloh Village. Lincoln argues that Shiloh Village created no additional demand, because the water it received came from Everett.[2]

Under resolution A–717, the district charges customers connecting to the system after June 3, 1981, a GFC to cover the cost of improvements the District intends to construct by 1990. Those customers who had connected to the system prior to June 3, 1981, do not have to pay the GFC.

Shiloh Village might receive less benefit from the District's planned improvements than other areas will receive because Shiloh Village is served by Everett facilities and Everett plans to assume complete responsibility for water services.[3] The trial court found, however, that Shiloh Village was to be generally benefited by at least two of the forty projects the District intends to build.

Lincoln bears the burden of proof that the rates are unreasonable. *Teter v. Clark Cy.,* 104 Wn.2d 227, 704 P.2d 1171 (1985). The charges are presumptively reasonable and will be upheld, unless it appears from all the circumstances that they are excessive and disproportionate to the services rendered. *Hillis Homes, Inc. v. PUD 1,* 105 Wn.2d 288, 300, 714 P.2d 1163 (1986).

If connection charges pay only for those improvements necessitated by new customers they are not discriminatory. *Hillis Homes,* at 300. Unlike *Hillis Homes,* the trial court here did not make a specific finding that the connection

---

[2]Lincoln also argued that the District did not have authority to impose the GFC. In *Hillis Homes, Inc. v. PUD 1,* 105 Wn.2d 288, 714 P.2d 1163 (1986), the Supreme Court held that a public utility district may impose a general facilities charge upon new customers desiring to connect to a district's water system. This holding resolves, in the District's favor, the issue of whether the District had authority to impose the GFC.

[3]Lincoln alleges in its brief that since the time of trial, Everett has assumed complete responsibility for Shiloh Village's water services.

charges paid for only those improvements necessitated by new customers. The trial court, however, found that the GFC was adopted in conformity with generally accepted practices in the water utility industry and that it was not unreasonable or discriminatory. It can be inferred from the findings, and the evidence supports the inference, that the GFC was created to pay for improvements necessitated by new customers.

The charges need not be individualized according to the benefits occurring to each specific customer. *Hillis Homes,* at 301. As long as the customer falls within a class of customers, and the classification and rates for that class are reasonably based, the charge is not unreasonable or discriminatory. *Hillis Homes,* at 301.

The District classified new customers into subgroups and allocated the charges based on a scientific statistical analysis of the projected cost of new improvements required for each group. The trial court found that Shiloh Village would be benefited to some degree by the new improvements. The evidence supports the classifications and the trial court's conclusion that the GFC was not unreasonable or discriminatory. *See Hillis Homes,* at 300–01.

### ESTOPPEL

Lincoln argues that the District should be estopped from applying the GFC to Shiloh Village because Lincoln reasonably relied on the statements by the District's manager that the only charges Lincoln would pay were the area charge, which amounted to $6,400, and a meter connection charge.

In *Beggs v. Pasco,* 93 Wn.2d 682, 689, 611 P.2d 1252 (1980), the Supreme Court held:

> The requisites for equitable estoppel are: (1) an admission, statement or act inconsistent with the claim thereafter asserted; (2) action by the other party on the faith of such admission, statement or act; and (3) injury to such other party arising from admission, statement or act.

The trial court found that in partial reliance on the Dis-

trict's permission to construct the water main extension and water system plans, Lincoln closed the purchase on the Shiloh Village property in late March, 1981. The trial court, however, could make no finding as to whether Lincoln would have closed the sale and proceeded with the project had it known that the GFC would be adopted.

The findings of the court are susceptible of a construction that would lead to a conclusion that Lincoln acted upon the District's statements. They may also be construed as supporting the trial court's conclusion that the doctrine of equitable estoppel does not apply to this case because Lincoln did not show that it altered its position in reliance on the District's statements. In such an instance the findings of fact must be construed in a manner which will support the trial court's conclusions of law. *See Shockley v. Travelers Ins. Co.,* 17 Wn.2d 736, 743, 137 P.2d 117 (1943).

The trial court could not conclude that, even had Lincoln known of the GFC, Lincoln would have altered its behavior. Lincoln failed to sustain its burden to prove that it relied on the District manager's statements by acting "on the faith" of the $6,400 connection fee.

### CONTRACT CLAIMS

The trial court granted a motion to dismiss Lincoln's contract claims at the close of the plaintiff's case. Lincoln contends the trial court erred, because the district violated its contractual duty of dealing in good faith by not informing Lincoln of its intention to create a GFC.

The trial court found that the District published notice of its public meeting which adopted the GFC and that the District's intention to adopt the GFC received attention in the area newspapers. In its oral findings, the trial court stated: "There was ample notice given of the defendant's intentions to adopt the regulations, both formal notices of meetings that may be required by law, as well as gratuitous media coverage." There is no basis for finding that the District violated a duty of good faith by not informing Lincoln of its intention to create the GFC.

132

The judgment of the trial court is reversed.

SCHOLFIELD, C.J., and WILLIAMS, J., concur.

Review denied by Supreme Court December 2, 1986.