[No. 19244-0-III. Division Three. November 15, 2001.]

IRVIN WATER DISTRICT NO. 6, *Appellant*, v. JACKSON PARTNERSHIP, ET AL., *Respondents*.

114

116

*Dennis P. Hession* and *Michael J. Miller* (of *Richter-Wimberley*), for appellant.

*Robert Drummond*, for respondents.

SWEENEY, J. — This is a dispute between real estate developers and Irvin Water District No. 6 over connection fees. The District provided the developers with water for fire and construction purposes. Later it substantially increased the connection charges. It did so before the developers actually applied for service and tendered the connection fees. The primary question before us is whether the District was committed to the connection fees in place when

it first provided water to the developers. We have concluded that the District is not bound under any legal or equitable theory to supply water at the old, lower connection fees and that the appropriate fees were the fees in effect at the time the developers actually formally applied for and tendered the connection fees. We therefore reverse the trial court's ruling to the contrary. We do, however, remand the case to the trial court for calculation of the appropriate connection fees set out in former RCW 57.08.010(3) (1994).

## I. FACTS

### A. PARTIES

Gunning and Lawson Investments (G&L) built an apartment complex. William Lawson and Stephen Schmautz, the Jackson Partnership, built a commercial building. Both projects are within the service boundaries of Irvin Water District No. 6. G&L and Jackson will be collectively referred to as the "Developers."

### B. WATER USE FOR CONSTRUCTION

G&L talked to the District's General Manager, George Shearer, about water service in January 1994. Mr. Shearer quoted an incorrect connection fee. But he did approve G&L's proposed utilities plan on February 18, 1994. The utilities plan stated that the District had sufficient water to supply the Developers' projects.

Sometime during the spring, Betty Skillingstad, the District's Office Manager, reminded Mr. Lawson of the need to formally apply for water service and pay the connection fees.

Construction on G&L's apartments began in late March 1994. The District provided water for fire protection and construction purposes at least by the end of April 1994. The Developers had installed several hundred feet of eight-inch water main as part of the project by the end of April. The water line became the District's property upon completion of the project. At the same approximate time, G&L tapped into the District's water service at four different locations.

Two additional taps were made into the new eight-inch main line. The District's manager approved these connections. Water was not yet, however, available for domestic use because it had not been tested. The Developers used the water for construction and fire control only.

C. CONNECTION FEE ADJUSTMENT

The District's Board of Commissioners met in June 1994, and talked about new growth, its effect, and the need to adjust connection fees to reflect increased costs.

Ms. Skillingstad called Mr. Lawson after the June Board meeting and again reminded him of the need to file an application for service and the need to pay the connection fees. She also reported that the District was considering an increase in connection fees.

On July 12, 1994, the District's Board adopted a new connection charge of "$1,000 per unit for multi-unit buildings." Clerk's Papers at 94. Fees for the apartment project under the new fee schedule rose from $19,000 to $140,000.

The Developers never applied for service or paid the connection fees requested by the District. Both steps are required by District regulations and bylaws to secure service.

The District told the Developers of the increased connection fees. The Developers then tried to tender the fees required under the old schedule. The District rejected the tender.

D. COURT PROCEEDINGS

The District sued for a judicial declaration that the new connection fees were lawful and that they applied to the Developers.

Following a bench trial, the judge concluded that the new connection fees were properly adopted and lawful. But the judge also concluded that the Developers became "customers" of the District before adoption of the new charge. It therefore permitted the Developers to pay the fees in effect before adoption of the new increased connection fees.

The District appeals, arguing that the new connection fee is applicable to the Developers. The Developers cross-appeal, arguing the new fee is really an invalid tax and that it was calculated incorrectly.

## II. APPLICATION OF CONNECTION FEE

### A. STANDARD OF REVIEW

■ "The standard of review for a trial court's findings of fact and conclusions of law is a two-step process. First, we must determine if the trial court's findings of fact were supported by substantial evidence in the record. If so, we must next decide whether those findings of fact support the trial court's conclusions of law." *Landmark Dev., Inc. v. City of Roy*, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999).

### B. CUSTOMER

The trial judge conferred the status of "customer" on the Developers and then ascribed legal consequences to that status, tantamount to "vesting."[1] But we find no statute, case, or rule that attaches legal consequences to the status of "customer" in this context.

The questions here are whether these new connection fees apply to the Developers and, of course, if they do, why?

The District argues that the Developers must pay the new connection fees because they neither applied for service nor paid the applicable fees before the Board adopted the new fees. The Developers respond that the new fees do not apply to them for a variety of reasons. First, they were "vested" under the old fees. Next, they had an implied contract with the District for the old fees. Or, finally, the District is either estopped or has waived its right to apply the new fees to them. We consider each of the arguments in order.

---

[1] The vested rights doctrine gives developers the right to have their land use applications processed under the zoning and building ordinance in effect at the time of the application. *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 50-51, 720 P.2d 782 (1986).

120

## C. Vesting

The Developers argue that they have a vested right to the connection fees in place on July 11, 1994, and rely on *Landmark Development, Inc.*[2] The District responds that the Developers were not vested and rely on *Lincoln Shiloh Associates v. Mukilteo Water District.*[3] Each party argues that its case is dispositive of the question here.

### 1. *Lincoln Shiloh Associates v. Mukilteo Water District*

In *Lincoln Shiloh*, the developer had planned a 208-unit apartment complex. The development fell within the Mukilteo Water District. Lincoln needed to extend a water main owned by the district in order to obtain service. Lincoln submitted plans for extending the water main in February 1981. The district approved the plans in March. *Lincoln Shiloh Assocs. v. Mukilteo Water Dist.*, 45 Wn. App. 123, 125-26, 724 P.2d 1083, 742 P.2d 177 (1986).

Lincoln began building the water main in May 1981. On June 3, 1981, the district commissioners adopted a new connection fee—a fee based on the number of units rather than the square footage. The resolution stated the new fee applied to all customers connecting to the district after June 3, 1981. *Id.* at 126.

Lincoln applied for service and paid, albeit under protest, the increased connection fee. It then filed suit to recover the fee. *Id.* The trial court concluded that Lincoln's right to connect to the district under the old connection fee schedule vested on February 18, 1981—the date it applied to extend the water main. *Id.* at 126-27.

■ The Court of Appeals reversed. It held that the vesting cases[4] were inapplicable. What vests is the right to use land in a specific way. Vesting does not include the right to water service at a specific rate. *Id.* at 128-29. No municipal corporation is bound by a connection fee schedule

---

[2] 138 Wn.2d 561.

[3] 45 Wn. App. 123, 724 P.2d 1083, 742 P.2d 177 (1986).

[4] *W. Main Assocs.*, 106 Wn.2d 47; *Mercer Enters. v. City of Bremerton*, 93 Wn.2d 624, 611 P.2d 1237 (1980); *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958).

for service to be provided at a future date unless there is a contract to provide such service at that rate. *Id.* at 128.

2. *Landmark Development, Inc. v. City of Roy*

The Developers rely on *Landmark*. There, two different developers (Landmark and New Concept) obtained letters from the City of Roy stating that water was available for their respective projects. *Landmark*, 138 Wn.2d at 565. The water connection fee was set at $350 when the City sent the letters. *Id.* at 566.

New Concept constructed its water system and was ready to connect to the City's water system by July 1993. The City had sent New Concept a bill on June 15, 1993, charging $350 per connection. New Concept paid the bill on October 21, 1993. *Id.* The City later learned (after New Concept had connected to the system and been billed) that it needed to supplement its 1982 comprehensive water system plan. It did so, and then increased the connection fee to $920 as part of the process on October 11, 1993. *Id.* at 566-67.

Landmark attempted to pay its connection fees on September 21, 1993, a month prior to the increase. But Landmark had not started the design or the construction of its water system. It had not, in fact, submitted its water system plans. *Id.* at 567. The City rejected the tender.

Landmark sued the City claiming among other things that the City acted arbitrarily and capriciously by charging two similarly situated developers different connection fees. *Id.* at 567-68, 573. The trial court agreed. The Court of Appeals disagreed and reversed. *Id.* at 568.

The Supreme Court affirmed the Court of Appeals. It held that the City could charge New Concept and Landmark different connection fees because they were not similarly situated. The court relied on the fact that New Concept had completed its system and hooked up to the City's water system. Landmark, on the other hand, had not started construction of its system nor submitted its plans. *Id.* at 573-75.

But the important point in *Landmark* for our purposes here is that the issue addressed by that court is different.

The issue there was

> whether a municipality, in determining its water system users' equitable share of the system's cost via the computation of water charges authorized under RCW 35.92.025, must deduct grants and donations used for improving the water system. We are also asked to decide whether a municipality may charge a different connection fee to two similarly situated developers.

*Id.* at 563. Nowhere does the court in *Landmark* say that New Concept was vested in the old fee structure or that some level of construction warrants application of a then existing fee schedule. The Developers' reliance on *Landmark* is therefore misplaced.

*Lincoln Shiloh*, on the other hand, is on point and controlling. The Developers here, like the developers in *Lincoln Shiloh*, did not have a vested right in any particular fee schedule, at least before application and payment of the applicable connection fees. *Lincoln Shiloh*, 45 Wn. App. at 128-29.

D. IMPLIED CONTRACT

The Developers next argue that the District impliedly contracted to supply water under the old connection fee structure.

■ An implied contract comes about when through a course of dealing and common understanding, the parties show a mutual intent to contract with each other. *Bell v. Hegewald*, 95 Wn.2d 686, 690, 628 P.2d 1305 (1981).

■ So, for example, a contract to supply water may be found when "a municipality holds itself out as a public utility willing to supply all those who request service in a general area." *Brookens v. City of Yakima*, 15 Wn. App. 464, 466, 550 P.2d 30 (1976). But a water district is not bound to a particular fee schedule. And none of the cases cited say that it is. Any implied contract between the Developers and District here would be for water service only, but not service at a particular connection fee. The mutual intent demonstrated here was for water service only, not at a specific cost. *Bell*, 95 Wn.2d at 690.

Indeed, the District's office manager called Mr. Lawson twice and reminded him of the need to apply for service and pay the applicable connection fees. She did this before the Board adopted the new fee schedule.

In sum, exchanges here support a mutual agreement to supply water to these projects, but not at any particular fee.

E. ESTOPPEL

The Developers next argue that equitable principles of promissory or equitable estoppel require that they be allowed to pay their connection fees under the old schedule.

■ The District first argues that these defenses were not properly pleaded. But even if the issues were not properly raised, it is clear from the record that they were both briefed and argued. *Amende v. Pierce County*, 70 Wn.2d 391, 400, 423 P.2d 634 (1967) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). And we will therefore consider them.

1. Promissory Estoppel

■ Promissory estoppel requires proof of five elements: (1) a promise, (2) a reasonable expectation that the promisee will change his or her position, (3) a change in his or her position, (4) justifiable reliance by the promisee, and (5) an injustice that can be avoided only by enforcing the promise. *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259 n.2, 616 P.2d 644 (1980).

The Developers argue that the District promised to supply water "upon the stated terms and conditions." Resp'ts' Br. at 33. But they fail to state what those terms and conditions were.

Certainly the District never promised to supply water at a given fee schedule. Mr. Shearer's first fee quote was inaccurate. And the trial court concluded that his quote could not be relied upon. The Developers do not challenge these findings or the court's conclusion.

The Developers' proposed utilities plan makes no men-

tion of fees. And the phone calls from District employees to Mr. Lawson included no promise of a particular fee. The District employees warned that the connection fees might be increased. Indeed, the only document with a provision for listing the amount of fees was the "APPLICATION FOR WATER SERVICE"—a document the Developers never completed.

In sum, the District never promised the Developers that it was going to charge a particular connection fee. The Developers do not, therefore, satisfy the first element of promissory estoppel. *Klinke*, 94 Wn.2d at 259 n.2.

2. Equitable Estoppel

■ Equitable estoppel has three elements: (1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from the inconsistent admission, statement, or act. *Beggs v. City of Pasco*, 93 Wn.2d 682, 689, 611 P.2d 1252 (1980); *Lincoln Shiloh*, 45 Wn. App. at 130. The reliance in element (2) must be justified. *Liebergesell v. Evans*, 93 Wn.2d 881, 889, 613 P.2d 1170 (1980).

Again, all agree that the only actual statement of what the connection fees would be was inaccurate and could not be reasonably relied upon. There is no statement, act, or admission by the District as to what the connection fees would be. The Developers were warned, by the District, that the connection fees might increase. And again, the only document with a provision for listing the amount of fees was the "APPLICATION FOR WATER SERVICE" that the Developers never completed.

The District simply never made any statements regarding the amount of the connection fees that could have been justifiably relied upon by the Developers. And we, therefore, find no basis for equitable estoppel.

F. WAIVER

Finally, the Developers contend that the District waived its required application for services by assisting the Devel-

opers in physically tapping into the District's water and by providing water for construction and fire protection.

■ A waiver is the intentional relinquishment of a known right. *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 353, 779 P.2d 697 (1989); *Ward v. Richards & Rossano, Inc.*, 51 Wn. App. 423, 434, 754 P.2d 120 (1988).

■ The Developers argue that the District waived its right to require an application for water service by participating in the physical connection to its water system and by providing water on a limited basis for construction purposes and fire protection. But the District requested that the Developers file their applications for service and tender the connection fees at about the same time it assisted the Developers.

The District cannot waive a right—to proper applications and payment of fees—while insisting that these requirements be met. *Id.* (waiver requires an intentional relinquishment of a right).

Clearly the District agreed to provide water. The District did not, however, ever agree to provide water based on the old fee schedule.

## III. PROCEDURAL CHALLENGES TO CONNECTION FEES

■ The District's authority to impose fees is derived from former RCW 57.08.010(3) (1994). It gave water districts the power to set rates and charges for water service, as well as to charge property owners a connection fee before hooking up to the system. Former RCW 57.08.010(3) (1994). The idea was that new users would bear their equitable share of the system's cost through the new connection fee. *Id.*

The District then had the express authority to impose connection fees. *Id.*

A. RECORD OF VOTE

■ The Developers first argue that the new connection

fee was never properly voted on or adopted. Their argument is based on the minutes of the July 12, 1994 Board meeting. The minutes do not reflect whether a vote was taken on the new fees. The trial court, nonetheless, found that the increase was properly approved by a vote based on "physical testimony that, in fact, a vote was taken and the minutes of the July meeting indicate that a motion was seconded to adopt a new rate structure." Report of Proceedings (RP) at 478. And "[t]he only thing lacking is a notation in the minutes that it was, actually, voted upon and, then, a certificate indicating the vote, as far as the commissioners are concerned." RP at 478. The court's finding is supported by a commissioner, who testified that all the commissioners voted in favor of the resolution adopting the new fees.

The Developers argue that the court erred by relying on any evidence outside the minutes of the meeting to find that a vote occurred. They rely on *Buell v. City of Bremerton.*[5] Their reliance is misplaced.

*Buell* resolved a challenge to the City of Bremerton's decision to rezone some property from residential to commercial. *Buell v. City of Bremerton*, 80 Wn.2d 518, 520, 495 P.2d 1358 (1972). One of the arguments was that the board's decision was void because the chairman had a personal interest in the outcome. *Id.* at 523. A subissue was whether or not the chairman actually voted. *Id.* at 524-25. The problem in *Buell* was what to do when courtroom testimony *conflicts* with the minutes. *Id.*

But here, the testimony relied on by the trial court did not conflict with the minutes. In fact, testimony that a vote was taken is in complete harmony with the minutes—as the minutes reflect a motion to implement the new fees was made and seconded.

This case is factually similar to *Fezzey v. Dodge.*[6] There, the issue was whether Snohomish County wrongfully denied Mr. Fezzey employment as a custodial officer. *Fezzey v.*

---

[5] 80 Wn.2d 518, 495 P.2d 1358 (1972).

[6] 33 Wn. App. 247, 653 P.2d 1359 (1982).

*Dodge*, 33 Wn. App. 247, 248, 653 P.2d 1359 (1982).

One question was whether Mr. Fezzey had "special eligibility status." *Id.* at 256. The County argued Mr. Fezzey's eligibility status had been voted on by the commission. *Id.* The minutes of the service commission meeting indicated that the commission voted to extend the status of a "gentleman" for only four months. *Id.* at 256-57. Mr. Fezzey argued he was not the "gentleman" referred to in the minutes. *Id.* at 257. The court agreed, holding Mr. Fezzey had raised an issue of fact to be decided by a jury. *Id.* The significant portion of the holding for our purposes here is that it was resolved as a question of fact.

 ██ Here, whether the Board voted is a factual question. And the trial court's factual finding is amply supported by substantial evidence. *In re Foreclosure of Liens*, 123 Wn.2d 197, 202, 867 P.2d 605 (1994).

B. REGULATORY FEE VERSUS TAX — STANDARD OF REVIEW

 ██ Charges imposed by a water district are presumptively reasonable and will be upheld, unless it appears from all the circumstances that they are excessive and disproportionate to the services rendered. *Hillis Homes, Inc. v. Pub. Util. Dist. No. 1*, 105 Wn.2d 288, 300, 714 P.2d 1163 (1986); *Prisk v. City of Poulsbo*, 46 Wn. App. 793, 804, 732 P.2d 1013 (1987); *Lincoln Shiloh*, 45 Wn. App. at 129. The party challenging the fee bears the burden of proof that the charge or fee is invalid. *Hillis Homes*, 105 Wn.2d at 300; *Prisk*, 46 Wn. App. at 804; *Lincoln Shiloh*, 45 Wn. App. at 129.

 The Developers argue that the new connection fee is not a regulatory fee, but rather an improper tax. To address this challenge, we ask three questions: (1) Is the primary purpose to raise revenue or to regulate? (2) Is the money collected spent for nonregulatory purposes? (3) Is there a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer? *Thurston County Rental Owners Ass'n v. Thurston County,*

85 Wn. App. 171, 178, 931 P.2d 208 (1997) (citing *Covell v. City of Seattle*, 127 Wn.2d 874, 879, 905 P.2d 324 (1995)).

■ First, the purpose of the fee here is clearly to regulate the distribution of water within the Irvin Water District. We base this observation on the regulation plan. *Rental Owners*, 85 Wn. App. at 178. As the court in *Hillis Homes* stated: "The District has exacted a connection charge from its new water system customers as part of an overall plan to regulate the use of water. . . . The fact that the connection charge necessarily imposes some burden on new customers does not make it an invalid tax." 105 Wn.2d at 299-300.

■ ■ Second, we find no evidence anywhere in this record that any of the new connection fees have been spent on nonregulatory purposes. The Developers argue, nonetheless, that the fee should be held invalid because the funds collected are not earmarked for new construction only. But the statute, former RCW 57.08.010(3) (1994), imposes no requirement that funds be placed in a separate account. And, in any event, the segregation of funds is not dispositive. *Covell*, 127 Wn.2d at 885.

Finally, the last factor requires a direct relationship between the fee charged and the service provided. *Rental Owners*, 85 Wn. App. at 178. Here, the connection fee is imposed *only upon people connecting to the District's water system for water service.*

■ The connection fee imposed by the District is a regulatory fee and not a tax. *See id.*

C. Unfair Application of the Connection Fee

■ The Developers also complain that the new connection fee is unfair because it applies only to multi-unit buildings, and not single-family homes, duplexes, and triplexes. But water districts may charge different classes of customers different fees so long as the classification system is itself reasonable. *Hillis Homes*, 105 Wn.2d at 301.

■ And here, the District applied the per-unit connection fee only to multi-unit structures. It required other

buildings to obtain a meter for each unit. G&L's apartment building used only five meters for 120 units. And yet individual units in multi-unit structures use about the same amount of water as units in smaller structures. Multi-unit structures also have more burdensome fire flow requirements. And they often support pools and spas. This increased connection fee then served as an equalizer. The disparity between multi-unit structures and smaller structures is reasonable. *Id.*

Moreover, the charges need not be tailored individually to the benefit received by each customer. *Id.* " '[O]nly a practical basis for the rates is required, not mathematical precision.' " *Id.* (emphasis omitted) (alteration in originial) (quoting *Teter v. Clark County*, 104 Wn.2d 227, 238, 704 P.2d 1171 (1985)). Here, the District had a practical basis for imposing the per-unit connection fee to multi-unit structures.

D. Calculation of the Connection Fee

The Developers finally contend that the new connection fee was not properly calculated because it (1) took into account the cost of existing projects, (2) was not based on the adopted comprehensive plan, and (3) fails to divide the costs on a pro rata share.

Former RCW 57.08.010(3)(a) (1994) spells out the method for calculating fees. It requires that the fee reflect: (1) the pro rata share of the cost of existing facilities and facilities planned for construction within the next 10 years and contained in an adopted comprehensive plan; (2) other costs borne by the district which are directly attributable to the improvements required by property owners seeking to connect to the system; and (3) the fee cannot include those portions of the system which have been donated or which have been paid for by grants. Former RCW 57.08.010(3)(a) (1994).

In *Hillis Homes*, the court approved a pro rata method called a proportionate share analysis. The specifics are not particularly helpful in our analysis here. But, in general,

the court approved a method that considered the purpose for each new charge. That is, whether the old customer or new customer or both were benefited by the new projects. *Hillis Homes*, 105 Wn.2d at 292-93, 300-01.

Here, the District did not determine a new users' pro rata share of the existing system plus new construction. Instead, the District ignored the value of the existing system (with one exception) and merely divided the cost of new construction among the new users.

On advice of an expert, the District took the total cost of future projects ($1,250,000) plus the cost, minus grants, of an existing reservoir ($460,000) for a total of $1,710,000. It then divided that amount by the number of anticipated future customers (1,400) to arrive at a connection fee of $1,220. The District then settled upon $1,000 as the new connection fee.

The trial court determined that the expert's advice to allocate the cost of all future projects solely to new customers was justified because he did not add in the value of the current system, as required by former RCW 57.08.010(3)(a) (1994).

The resultant fee may well be fair and reasonable. But the calculation does not comply with the statute. Former RCW 57.08.010(3)(a) (1994) ("For purposes of calculating a connection charge, the board of commissioners *shall* determine the . . .") (emphasis added). Shall is obligatory. *Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 907-08, 949 P.2d 1291 (1997).

Connection fees are not

cost recovery mechanisms for utility purveyors. . . .

Instead, these statutorily authorized fees provide the means by which a purveyor may equitably allocate to new users access to an existing system possessing an existing value. In addition, the fees become a resource through which the utility purveyor may fund necessary capital improvements to the utility system.

*Landmark Dev., Inc. v. City of Roy*, 138 Wn.2d 561, 572, 980 P.2d 1234 (1999).

The fee charged here may well be lower than if the statute had been strictly followed. But that is not the test.

It is impossible to arrive at the correct connection fee without valuing the existing system. The court then erred by concluding that the District calculated its connection fee based on former RCW 57.08.010(3)(a) (1994). It did not.

## IV. SUMMARY

A. The new connection fee was applicable to these Developers. The trial court erred by concluding that they were exempt from the fee because they were "customers."

B. The District committed itself to provide water, but not at a particular fee.

C. The connection fee was a regulatory fee and not a tax.

D. The District's decision to apply the fee only to multi-unit structures is reasonable.

E. The District's new connection fee was not properly calculated. Former RCW 57.08.010(3)(a) (1994).

We therefore reverse the trial court and remand for recalculation of the connection fee applicable to the Developers.

BROWN, A.C.J., and SCHULTHEIS, J., concur.

Reconsideration denied January 9, 2002.

Review denied at 147 Wn.2d 1003 (2002).