[No. 36385-2-II.   Division Two.   September 3, 2008.]

PALERMO AT LAKELAND, LLC, *Respondent*, v. THE CITY OF BONNEY LAKE, *Appellant*.

---

[28] RCW 4.84.370; *Habitat Watch*, 155 Wn.2d at 413.

*Lance M. Andree* and *Kathleen J. Haggard* (of *Dionne & Rorick*), for appellant.

*George R. Hill* (of *McCullough Hill, PS*), for respondent.

¶1 BRIDGEWATER, J. — The city of Bonney Lake (City) appeals the Pierce County Superior Court's decision that its system development charge (SDC) was unreasonable. We hold that the City arbitrarily adopted ordinance 1192 under which it assessed Palermo for connecting to the City's water system; thus, the ordinance was void, leaving the prior

ordinance in effect. But the trial court erred when it applied a remedy that calculated the proper charge based on the City's expert, who justified the City's ordinance retroactively, and awarded attorney fees under the common fund doctrine. We remand, holding that the City must calculate Palermo's SDC under ordinance 919 and, if Palermo paid more than ordinance 919 required, it is entitled to prejudgment interest calculated on the difference between what it paid under the void ordinance and the proper ordinance. We affirm in part, reverse in part, and vacate in part.

## FACTS

¶2  Palermo is the developer for a large residential complex in Auburn, Washington, that will ultimately consist of 23 apartment buildings containing 362 total units and 1 recreation building. Although located in Auburn, the project is situated within the City's water service area. Thus, Palermo must pay the City to connect to its water system.

¶3  An "SDC" is a one-time connection charge paid by new development to finance the construction of public facilities needed to serve it. RCW 35.92.025 authorizes cities to charge property owners seeking to connect to the water system "such reasonable connection charge as the legislative body . . . shall determine proper in order that such property owners shall bear their equitable share of the cost of such system." The City calculates SDCs for multifamily units such as Palermo's based on a multifamily equivalency factor because those units use slightly less water than single-family units.

¶4  As part of its budget process, Palermo monitored the City's SDC when it started its project. As construction progressed, Palermo observed multiple changes in the charges. But before addressing the history of the ordinances, it is necessary to examine the recent history of the City's SDC.

HISTORY OF THE CITY'S SDC

¶5 WAC 246-290-100 requires each water system to prepare and adopt a comprehensive water system plan once every six years. In 1996, the City authorized RH2 Engineering to prepare the City's comprehensive water system plan, which the City adopted and the state Department of Health approved. The 1996 plan included a financial analysis of the City's ability to fund capital improvements, ongoing operations, and maintenance programs. The 1996 plan also included a study and recommendation, in which RH2 proposed an increase in the SDC imposed on new customers.

¶6 RH2 used the average cost method to make its recommendation. In it the City valued its water system so that existing customers could recover their investment. The City then established the estimated value of new growth for its six-year capital improvements program (CIP). The City then divided the sum of the value of its water system and the value of new growth in its six-year CIP by the number of anticipated equivalent residential units (ERUs) that would begin using the system within that six-year time frame.

¶7 In 1999, RH2 advised the City that it would need to obtain additional water supply "very soon." Clerk's Papers (CP) at 139. The City considered purchasing either two million gallons per day (MGD) or four MGD from the city of Tacoma, Washington. The four MGD purchase would have cost the City $11,800,000. In 2004, the City purchased two MGD from Tacoma for $5,776,598.

¶8 In 2004, the City updated its 1996 comprehensive water system plan following a comprehensive study that RH2 began in October 2002. The 2004 plan, however, did not include analysis, calculation, or recommendation, apparently because the City did not request it. The 2004 plan estimates the cost of the six-year CIP (through 2009) to be $35,780,000 and includes the planned purchase of two MGD from Tacoma. The City estimated that there would be 15,347 new ERU.

¶9 In 2004, the City also commissioned HDR Engineering Services, Inc., and Engineering Services, Inc., (HDR/EES) to conduct a water and sewer rate study to determine the adequacy of the existing water and sewer system rates and to provide the basis for any necessary adjustments. The City timed this study to support the financial analysis in the 2004 plan. HDR/EES's proposal to the City included preparation of a study to provide factual and analytic support for a rate increase, but the SDC study somehow "fell through the cracks." CP at 140. The City never asked HDR/EES to complete its analysis. The City did adopt all of the water usage rate recommendations[1] that HDR/EES made, but it did not receive any advice or input with respect to the SDC rates.

¶10 The record shows that in March 2004, the City was contemplating purchasing four MGD from Tacoma. To determine the financial viability of such a purchase, the City asked Geoff Dillard of RH2 to determine what might be in that event. Dillard provided a one-page spreadsheet in April 2004 titled "Preliminary (prior to 2004 Comprehensive Water Plan Completion)" that assumed a four percent growth rate and an $11,800,000 water purchase from Tacoma. CP at 140-41. Using these assumptions, Dillard calculated a SDC of $6,580 per ERU. The City never asked Dillard to finalize his spreadsheet and he never entered into discussion with the City about his analysis. Neither did he make a recommendation to the City as to what would constitute an appropriate SDC in light of the 2004 plan, which included the purchase of only two MGD from Tacoma. Dillard testified that if he had been able to use the data set forth in the 2004 plan, he would have done so.

¶11 Dillard's preliminary spreadsheet includes a six-year CIP of $44,489,510, including the $11.8 million for the anticipated four MGD from Tacoma. Dillard also estimated that there would be 14,209 ERU at the end of the six-year

---

[1] This is the rate that the City charges its existing customers for water use and is not to be confused with the SDC connection charge.

period. In fact, the 2004 plan revised the six-year CIP to $35,780,000, due in part to the City's decision to purchase only two MGD from Tacoma for $5.6 million. The 2004 plan revises the new ERU estimate up to 15,347.

ORDINANCES REGARDING SDC

¶12 Under Bonney Lake City Ordinance 919, the ordinance in effect when Palermo began planning the project, Palermo would have owed approximately $1,496,000 for SDCs. In late 2004, the City asked Assistant Public Works Director Gary Leaf to draft an update of the City's SDC. After Leaf drafted it, the City adopted ordinance 1073 in November 2004, which revised the multifamily equivalency factor so that instead of calculating the SDC on a per unit basis, the City would use a per meter basis. Under ordinance 1073, Palermo would owe approximately $375,000.

¶13 Later that month, Leaf presented proposed ordinance 1083 to the City, which would again revise the SDC schedule. Leaf testified that he used Dillard's preliminary spreadsheet to establish the $6,500 figure in ordinances 1083, 1094, and 1100. In the background summary the public works director prepared to explain the ordinance to the city council, the public works director stated:

> As part of the 2005 utility rates study, staff recommends adoption of updated water and sewer system development charges (SDCs). This ordinance will raise the water SDC from $4,700 to $6,500 . . . effective January 1, 2005. The SDC analysis was performed by staff and RH2, and this analysis was reviewed by Economic and Engineering Services (EES), the rate consultant. EES believes the SDCs included here are defensible.

Ex. 52.

¶14 This summary is inaccurate. The 2005 rate study, presumably referring to the HDR/EES 2004 rate study, did not analyze or recommend adoption of updated SDCs. Further, Dillard did not prepare his preliminary spread-

sheet to make a recommendation for SDCs but, instead, to determine the possible effect on SDCs of a four MGD water purchase from Tacoma. EES never reviewed the SDC analysis and never advised the City that the SDC was defensible. Finally, the staff never analyzed the appropriateness of the SDC. Instead, Leaf acknowledged that he relied on Dillard's preliminary spreadsheet. Under ordinance 1083, Palermo would owe approximately $540,000.

¶15 In January 2005, the City again amended its SDC with ordinance 1094, which removed the per meter charge and returned to the per unit charge calculation. This ordinance would have resulted in a charge of $7,116,000 for Palermo.

¶16 In February 2005, the City adopted ordinance 1100, which changed the method of calculation for multifamily units. This was the ordinance in effect at the time that Palermo paid the SDC under protest. Under ordinance 1094, the City charged the developer with a fee per unit and an additional fee for each additional unit. Ordinance 1100 decreased the additional unit fee to $5,250. This would result in a charge to Palermo of approximately $2,450,000. The breakdown of charges required Palermo to pay $6,500 for the first unit of each building and approximately 80 percent of that total, an additional $5,250, for each additional unit. These are the two figures that Palermo challenged in this case.

¶17 Palermo researched the City's six-year capital facilities plan and felt that the City was charging it an unreasonable amount for the SDC and subsequently contacted the City. Palermo's project manager, Sean Martin, wrote Leaf an e-mail, asking to sit down to discuss how the City determined its fees. Public Works Director Daniel Grigsby answered the e-mail and replied in bold type:

**Hi Sean and Gary; Changing our SDC fees is not going to happen now or in the near future. They are what they are. We just completed spending considerable money, and staff/council time reviewing these details. If**

INVESTCO wants to develop in a Bonney Lake service area[ ], that is the cost of doing business!

Ex. 15. At trial, Grigsby acknowledged that he had "shut off communication" with Palermo. 3 RP at 182.

¶18 Palermo paid the fees under protest and filed this suit for a refund on September 12, 2005. As of trial, Palermo had paid $2,204,124.50.[2] The City refunded $129,500.00 under ordinance 1192, which the City adopted in June 2006. The remaining contested total at trial was $1,973,224.50.

¶19 About the same time that the City adopted ordinance 1192, the city attorney retained Edward Cebron of Financial Consulting Solutions Group, Inc., as a consulting witness for this litigation. He asked Cebron two questions: (1) whether the City's SDC fee as set forth in ordinance 1192 was within the range of fees he would recommend to the City and (2) whether the City's use of the 80 percent multifamily equivalency factor was defensible. Cebron prepared a written report addressing the first question.

¶20 Cebron set forth three methodologies and calculated each based on the 6-year CIP and 20-year CIP for each, for a total of six evaluations. He used numbers and data from the City's 2004 plan. He found that four of his six scenarios provided equitable charges. He ultimately concluded that the $6,500 per ERU was within the range of a reasonable charge.[3] Cebron also provided a report on the multifamily equivalency factor. He initially reported that a factor of 70 percent would be simple and consistent with the data in the City's 2004 plan but that 83 percent would be consistent due to increased fire flow burdens for the multifamily units. Accordingly, the City argued, its 80 percent factor fell within the reasonable range.

---

[2] Palermo does not contest the amount of $101,400 that it paid for irrigation meters and a recreation building.

[3] As an aside, when the City reviewed Cebron's report, it adopted his evaluation as an additional basis supporting the 1192 ordinance's SDC in ordinance 1220.

RELEVANT TRIAL TESTIMONY

¶21 Palermo's expert, Gregory Hill, president of Roth Hill Engineering Partners, testified about the SDC, Dillard's preliminary spreadsheet, and Cebron's reports. With respect to the preliminary spreadsheet, Hill testified that the City did not use current numbers, which were available in its 2004 plan to set its SDC, and that it was not reasonable for a city to establish a charge based on a preliminary report. Because we hold that it was inappropriate for the City to rely on a retrospective justification of its ordinance, we do not detail Hill's testimony concerning his disagreement with Cebron. Suffice to say that Hill disagreed with Cebron.

TRIAL COURT'S FINDINGS

¶22 The trial court found that (1) Dillard's preliminary spreadsheet was not an appropriate or reasonable basis for adopting the fee schedules set forth in ordinances 1100, 1192, and 1220, because it was provisional and included assumptions proved incorrect by the time the City adopted the ordinances; (2) the usual presumption of validity applied to municipal ordinances did not apply in this case because Leaf did not base his analysis on an appropriate method or methodology; (3) Cebron's reliance on the 20-year CIP was unreasonable as the City has always based its SDC on its 6-year CIP and because such a lengthy period is too speculative; (4) the City's 80 percent multifamily equivalency factor was unreasonably high because the City never asked for nor obtained expert advice about what factor it should use and there is no rational basis to support Cebron's fire flow theory; and (5) the City's requirement that multifamily units pay the full connection cost is unreasonable. It further found that Cebron was not unreasonable when he included developer contributions in his calculations or when he allocated the Tacoma water supply to new growth.

¶23 The trial court ruled that Palermo was entitled to a declaratory judgment that ordinances 1100, 1192, and 1220 were void and inconsistent with RCW 35.92.025. The trial court remanded this matter to the City to adopt an ordinance amending ordinances 1100, 1192, and 1220 retroactively to February 8, 2005, enjoining the City to impose the SDC at a rate no higher than $6,100 per ERU and a multifamily equivalency factor of no higher than 77 percent. The trial court enjoined the City to provide refunds to all persons that paid SDCs under ordinances 1100, 1192, and 1220, including Palermo. Finally, the trial court awarded Palermo attorney fees under the common fund doctrine.

¶24 The City appealed and Palermo cross-appealed.

## ANALYSIS

### Standard of Review

¶25 This court reviews a legislative decision under the "arbitrary and capricious" test. *Teter v. Clark County*, 104 Wn.2d 227, 234, 704 P.2d 1171 (1985). An act is arbitrary or capricious if it is a willful and unreasonable action, without consideration and regard for facts or circumstances. *See Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 769, 49 P.3d 867 (2002) (citing *Teter*, 104 Wn.2d at 237).

¶26 We presume the validity of ordinances, but this presumption no longer exists when evidence discloses that the basis on which the ordinance establishes the fee is not the proper basis the statute authorized. *Boe v. City of Seattle*, 66 Wn.2d 152, 155, 401 P.2d 648 (1965). We will sustain a legislative determination if we can conceive of any state of facts that justify the determination. *Teter*, 104 Wn.2d at 234-35. We review the data the City considered when it adopted the ordinance. *Teter*, 104 Wn.2d at 236.

¶27 We review a trial court's findings of fact to determine whether substantial evidence in the record sup-

ports them, and we review the trial court's conclusions of law to determine whether the trial court's findings support them. *Landmark Dev., Inc. v. City of Roy*, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999). We review questions of statutory interpretation de novo. *Landmark*, 138 Wn.2d at 569. When interpreting a statute, we first look at its plain meaning from the statutory language itself. *Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155 (2006). Only if the statute is ambiguous do we resort to aids of statutory construction, including legislative history. *City of Olympia v. Drebick*, 156 Wn.2d 289, 295, 126 P.3d 802, *cert. denied*, 549 U.S. 988 (2006).

I. TRIAL COURT'S STANDARD OF REVIEW

¶28 As a preliminary matter, the City contends that the trial court applied an incorrect standard of review to reach its decision. Specifically, it contends that the trial court created a two-prong standard for reviewing the City's legislative decision to set its SDC: (1) were the charges reasonable or (2) did the City act arbitrarily in enacting the statute?

¶29 The trial court dedicated one of its conclusions of law to this standard. CP at 147. Conclusion of law 2 provides:

> Palermo has the burden to show that the SDC charges imposed by the City's ordinances are not "reasonable," or, alternatively, that the City, in enacting the ordinances, "acted arbitrarily." If the fees are "unreasonable" or the City acted arbitrarily, then the ordinances are void and Palermo is entitled to a refund. *Boe v. [City of] Seattle*, 66 Wn.2d 152, 401 P.2d 648 (1965); *Faxe v. City of Grandview*, 48 Wn.2d 342, 294 P.2d 402 (1956). Palermo does not have the burden to show what an equitable charge would be. *Boe v. [City of] Seattle, supra*. The presumption of validity of the ordinance does not hold when evidence discloses that the basis on which the ordinance establishes the fee is not the proper basis authorized by the statute. *Boe v. [City of] Seattle, supra* at 155.

CP at 147-48.

¶30 The City contends that the appropriate standard is whether the fee is so unreasonable that its enactment in law may be deemed arbitrary and capricious government action. The City cites *Teter*, 104 Wn.2d at 235, for the proposition that such fees are presumed reasonable and will be overturned only on the showing that they are the product of "willful and unreasoning action without consideration and regard for facts or circumstances." Br. of Appellant at 15. Palermo counters that under the requirements of RCW 35.92.025, *Boe* requires the plaintiff to show that the charge is unreasonable, while *Prisk v. City of Poulsbo*, 46 Wn. App. 793, 805, 732 P.2d 1013, *review denied*, 108 Wn.2d 1020 (1987), provides that SDCs can be overturned if they were "determined arbitrarily or unfairly."

¶31 Again, where a court is asked to review a legislative decision, the applicable standard of review is the "arbitrary and capricious" test. *Teter*, 104 Wn.2d at 234. An act is arbitrary or capricious if it is a willful and unreasonable action, without consideration and regard for facts or circumstances. *See Isla Verde*, 146 Wn.2d at 769.

¶32 It is not evident that *Boe* and *Prisk* are at odds with the arbitrary and capricious standard. Instead, *Boe* appears to establish which party bears the burden of proof and *Prisk* merely reiterates that arbitrary legislative decisions are not appropriate. We hold that the trial court did not use a relaxed standard that was inconsistent with the arbitrary and capricious standard. Instead, it found that Leaf's analysis, which served as the basis for ordinances 1100, 1192, and 1220, was not based on the appropriate methodology or appropriate numbers and, thus, implicitly was unreasonable and without consideration and regard for facts or consequences. Accordingly, the presumption of the ordinances' validity did not apply in this case. The trial court applied the correct standard of review.

## II. SINGLE-FAMILY SDC

¶33 Our analysis begins with a determination as to what RCW 35.92.025 requires the City to prove. RCW 35.92.025 provides in relevant part:

Cities and towns are authorized to charge property owners seeking to connect to the water or sewerage system of the city or town as a condition to granting the right to so connect, in addition to the cost of such connection, *such reasonable connection charge as the legislative body of the city or town shall determine proper* in order that such property owners shall bear their *equitable share of the cost of such system.*

(Emphasis added.) Therefore, the only requirements placed on the City are that the charge is reasonable and that the City bases these charges on the equitable cost of their water system. RCW 35.92.025.

¶34 The City argues that the statute does not require it to hire expensive expert consultants in order to establish a reasonable charge.[4] While this is correct, the City is nevertheless required to make the charge reasonable and to ensure that owners bear an equitable share of the system cost. RCW 35.92.025. This, by its plain language, requires that the City understand the cost of its system and that it base the SDC on those costs.

¶35 The City next contends that it was entitled to rely on Dillard's preliminary spreadsheet when it set its SDC. It contends that Dillard based his recommendation on a thorough analysis of the City's system cost and financial needs. The evidence does not support this assertion.

¶36 The trial court's conclusion of law 7 provides:

The "preliminary" spreadsheet prepared by RH2 was not an appropriate or reasonable basis for adopting the fee schedules

---

[4] The City claims that it was free to choose as it wanted because " 'only a practical basis for the rates is required, not mathematical precision.' " Br. of Appellant at 25 (quoting *Teter*, 104 Wn.2d at 238). But this proposition does not support this argument. The *Teter* court held that a county did not act arbitrarily by not individualizing each rate. *Teter*, 104 Wn.2d at 238.

set forth in Ordinances 1100, 1192 and 1220. The "preliminary" spreadsheet was provisional, was not geared for adoption of SDC fee schedules, and included assumptions, particularly relating to water usage to be purchased from the City of Tacoma, that were not correct at the time Ordinances 1100, 1192 and 1220 were adopted.

CP at 148-49. We review conclusions of law to determine whether the trial court's findings support them. *Landmark Dev.*, 138 Wn.2d at 573.

¶37 The trial court's findings of fact reveal that Dillard provided a spreadsheet titled "Preliminary (prior to 2004 Comprehensive Water Plan Completion)" that contained explicit assumptions of four percent growth and an $11.8 million water purchase. The findings also provide that Dillard did not conduct an SDC study, nor did he make a recommendation to the City in light of the 2004 plan. Finally, the findings include the actual figures from the 2004 plan, which Dillard testified that he did not use, but would have used if asked to calculate the SDC for the City.

¶38 Testimony by Dillard, HDR/EES, and Leaf support these findings of fact. Dillard himself testified that the City did not ask him to prepare a section in the 2004 plan; his preliminary spreadsheet did not have the benefit of the updated numbers that would appear in the 2004 plan; and that the City did not consult with him regarding ordinances 1073, 1083, 1094, 1100, or 1192. He further testified that he based his preliminary spreadsheet on the presumption that the City would purchase four MGD of water from Tacoma. HDR/EES did not participate in making recommendations regarding the SDC. Leaf testified that he relied solely on Dillard's preliminary spreadsheet to establish the $6,500 figure in ordinances 1083, 1094, and 1100.[5] That the SDC calculation varied so radically under the different ordi-

---

[5] Although it involved the ordinance preceding Ordinance 1100, the public works director misled the council about proposed ordinance 1083, stating that staff recommends adoption of updated system development charges, RH2 performed the SDC analysis, and EES believes the SDCs included here are defensible.

nances supports the arbitrariness of the City's action, i.e., $375,000 under 1073, $540,000 under 1083, $7,116,000 under 1094, $2,450,000 under 1100. Finally, the City based the ordinances on outdated and inaccurate numbers even though it could have looked at the current numbers contained in the 2004 plan, but it did not do so. Accordingly, the record supports the trial court's conclusion that the City arbitrarily adopted the ordinances containing the unreasonable SDC.

¶39 Several Washington courts have addressed RCW 35.92.025. For example, in *Boe*, 66 Wn.2d at 156, our Supreme Court found connection charges that the city of Seattle based on the replacement cost of the system, rather than on historical costs of the actual system, unreasonable. In *Prisk*, 46 Wn. App. at 804, this court determined that the city of Poulsbo satisfied its obligations under RCW 35.92-.025 because the city "acted deliberately and only after consideration of a comprehensive analysis of the historical costs of the system." The *Prisk* court further noted that the city provided considerable expert opinion in support of the reasonableness of the charges. *Prisk*, 46 Wn. App. at 805. Therefore, we held that the developers failed to demonstrate that the city of Poulsbo arbitrarily or unfairly determined their connection charges. *Prisk*, 46 Wn. App. at 805.

¶40 Applying this same analysis here, all the evidence supports that the City adopted the ordinances based on outdated and incorrect numbers. Rather than using any current numbers that were available in its 2004 plan or seeking any expert opinion before adopting the charges, the City relied solely on Dillard's preliminary spreadsheet. We agree with the trial court that Palermo proved that the SDC was unreasonable and that the City arbitrarily adopted it.[6]

---

[6] Because we hold that the ordinances were void and that Mr. Cebron's analysis is inappropriate to use as a retrospective justification of arbitrary City action, we do not address any argument concerning the court's finding of "multi-family equivalency." CP at 149.

### III. Use of Cebron's Report

¶41 Palermo argues on appeal that the trial court erred by allowing the City to justify its SDC with Cebron's report, which he created after the fact and in anticipation of this litigation.[7] Palermo argues that when Washington courts have upheld a connections charge ordinance, they did so based solely on the facts, information, and analysis presented to the city council at the time the ordinance was adopted. Palermo cites *Teter*, where the appellants challenged the reasonableness of a storm water utility charge based in part on a claim that their properties did not contribute to the increased surface water runoff. *Teter*, 104 Wn.2d at 236. The appellants submitted affidavits to that effect to the trial court in support of a summary judgment motion. *Teter*, 104 Wn.2d at 236. Our Supreme Court held:

> The affidavits of appellants have no bearing on the reasonableness of the [county's] decisionmaking process, which occurred several years prior to the swearing of those affidavits. The affidavits did not form a part of the data considered by [the county] in making [its] decision and are thus not relevant to our review of that decision.

*Teter*, 104 Wn.2d at 236.

¶42 The City counters that no legal authority prevents it from relying on an expert opinion as to whether its legislative action is reasonable. It points to *Prisk*, where this court upheld the connection fee based in part because the city of Poulsbo adduced "[c]onsiderable expert opinion" in support of the study and reasonableness of the charges. *Prisk*, 46 Wn. App. at 805. The City contends that this court must sustain its legislative determination if this court can reasonably conceive of *any facts* to justify that determination. *Teter*, 104 Wn.2d at 238.

¶43 Essentially, the City is arguing that it is not the process of adopting the ordinance that matters, only the ultimate charge. The City includes the following footnote:

---

[7] Palermo is not making an evidentiary challenge regarding the use of experts.

In this context, the standard of review Palermo advocates—that a court can unravel the legislative adoption of SDCs if it finds that the <u>process</u> of adopting the ordinance was arbitrary—makes no sense. Unlike some statutes that require municipalities to meet certain notice, hearing, public participation and other procedural requirements, RCW 35.92.025 contains no "process" other than to adopt SDCs legislatively. Moreover, the fact that the court must examine whether any conceivable set of facts supports the fee makes the process of adopting the SDCs irrelevant. Figuratively speaking, if the City Council chose an SDC by throwing darts at a dartboard, the SDC should still be upheld as long as a plausible set of facts supports the number.

Reply Br. of Appellant at 7 n.3. Accordingly, the City wants us to consider Cebron's alternate methodology in support of the challenged ordinance. The City's position is untenable.

¶44 Palermo counters that although expert opinion testimony is a normal part of litigation, the opinion testimony must relate to the data and information that was before the City at the time it adopted the ordinance. Palermo clarifies that it retained an expert, Gregory Hill, to review the data the City considered when it adopted the ordinances and, based on that data, its expert concluded that the SDC was neither reasonable nor equitable. In contrast, the City did not retain Cebron to review the data that the City considered in making its decision. Specifically, Cebron did not review Dillard's analysis and, instead, conducted an entirely new analysis with different assumptions and different data based on the 2004 plan.

¶45 The City asserts that we must sustain the SDC if we find any set of facts that could support the SDC. The City argues that Cebron provided a set of facts that would justify the reasonableness of the SDC during litigation. But the City's position would allow it to adopt any fee ordinance without any reasonable basis and then attempt to justify it only when a citizen files a lawsuit challenging the ordinance. This methodology flies in the face of what RCW 35.92.025 requires.

¶46 We hold that the City still bears the burden of satisfying RCW 35.92.025 by providing reasonable SDCs based on equitable shares of the cost of the system and that under *Prisk*, its decision cannot be arbitrary. *Prisk*, 46 Wn. App. at 805. The City failed this charge. We hold that while an expert opinion is permissible in support of SDC regarding information and data that was before the City when it adopted the ordinance, Cebron's new methodologies based on the 2004 plan are not relevant to this court's consideration. *Teter*, 104 Wn.2d at 236.

¶47 Although the trial court found that the SDC was unreasonable, it chose to adopt one of the six of Cebron's methodologies as a reasonable SDC for the City to adopt on remand. Conclusion of law 9 provides:

> Mr. Cebron's alternate two six-year evaluation results in a reasonable SDC fee of $6,036. Exhibit 78, p. 10.

CP at 149. The trial court also modified Cebron's multifamily equivalency factor by removing the fire flow investment and by considering the actual numbers that became available from the City as part of the 2004 plan, ultimately deciding that the City must adopt an equivalency factor between 75 percent and 77 percent in order to be reasonable.

¶48 The trial court then entered judgment enjoining the City to adopt an ordinance amending ordinances 1100, 1192,[8] and 1220 retroactively to impose SDCs at a rate no higher than $6,100 per ERU and a multifamily equivalency factor no higher than 77 percent of the new SDC. Neither party requested nor expected this remedy. In fact, the trial court's own finding that the initial SDC was unreasonable did not appear to be based on the trial court's belief that it was too large and, instead, appeared to be based on the fact that the City adopted it arbitrarily. As adopting a fee ordinance for SDCs is a purely legislative function under

---

[8] The judgment contains what appears to be a typo when it indicates ordinance 1194 instead of 1192.

RCW 35.92.025, the trial court erred in choosing a reasonable amount for the City to adopt.

¶49 In *Boe*, a case directly addressing connection fees, the remedy our Supreme Court provided was to void the ordinance and allow the city of Seattle to enact a new ordinance fixing a reasonable fee based on the cost of its sewer system rather than the cost of reconstructing such a system. *Boe*, 66 Wn.2d at 156. *Boe* notes that the legislature granted authority to set the reasonable charge to the city, not to the plaintiff, and certainly not to the courts. *Boe*, 66 Wn.2d at 156. Further, RCW 35.92.025 clearly provides the City authority to set *such reasonable connection charge as the legislative body of the city or town shall determine proper.* We reverse the trial court's order enjoining the City to use certain caps for its SDC; this also applies to any conclusions and orders based on Cebron's testimony, including the 20-year CIP.

IV. ORDINANCE 919 OPERATIVE

■ ■ ¶50 "We apply the same rules of statutory construction to ordinances as we do statutes." *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 59, 156 P.3d 185 (2007), *cert. denied*, 128 S. Ct. 1224 (2008). Further:

> It is the rule in [Washington] that an invalidly enacted statute is a nullity. It is as inoperative as if it had never been passed. *State ex rel. Evans v. [Bhd.] of Friends*, 41 Wn.2d 133, 247 P.2d 787 (1952). The natural effect of this rule . . . is that once the invalidly enacted statute has been declared a nullity, it leaves the law as it stood prior to the enactment. *Boeing Co. v. State*, 74 Wn.2d 82, 442 P.2d 970 (1968); 82 C.J.S. *Statutes* § 75, at 132 (1953); 16 [AM. JUR. 2D] *Constitutional Law* § 177, at 402 (1964).

*State ex rel. Goodner v. Speed*, 96 Wn.2d 838, 843, 640 P.2d 13, *cert. denied*, 459 U.S. 863 (1982).

> It was the well-defined rule at common law that where a statute is repealed, it is, as regards its operative effect, considered as if it had never existed, except as to matters and

transactions past and closed, and all pending litigation must be decided according to the state of the law at the time of the decision. 1 J. Sutherland, Statutes and Statutory Construction § 286 (166) (2d ed. 1904); G. Endlich, A Commentary on the Interpretation of Statutes § 478 (1888). *State v. Allen*, 14 Wash. 103, 44 P. 121 (1896); *and see Ettor v. [City of] Tacoma*, 57 Wash. 50, 106 P. 478, 107 P. 1061 (1910).

*State v. Zornes*, 78 Wn.2d 9, 12, 475 P.2d 109 (1970), *overruled on other grounds by State v. Benn*, 120 Wn.2d 631, 672, 845 P.2d 289 (1993).

¶51 Here, we address all ordinances on this issue the City adopted subsequent to ordinance 919. The City adopted all the subsequent ordinances arbitrarily. As ordinance 1220 relates specifically to Palermo and this litigation, we hold that the City's attempt to justify the SDC in ordinance 1192 by using Cebron's after-the-fact analysis fails because it is obvious from the record that the City did not consider this analysis when adopting ordinance 1192. We void ordinances 1094, 1100, and 1192, each of which arbitrarily relied on Dillard's preliminary spreadsheet. In addition, we hold ordinance 1220 void because it ratified a now nonexistent ordinance. Whether the City chooses to rely on Cebron's analysis in future ordinances is a legislative determination not before us. Accordingly, we hold that unchallenged ordinance 919 remains in effect for purposes of calculating the applicable charge for Palermo.

¶52 Under ordinance 919, Palermo asserts that its fee would equate to approximately $1,496,000. This approximation appears uncontested as the City did not object to Palermo's assertion that this would be the approximate amount. The City did allege in its trial brief that this remedy would not be appropriate here because it would result in a windfall for Palermo. The City cited to the trial court's statement during a previous summary judgment proceeding to the same effect.

> One of the things that bothers me about Palermo's position here is that if anybody would get a windfall here, it would be Palermo if you did this under the old 919 Ordinance, but I do

think there is authority under Boe [sic] and under general law for the idea that if these ordinances are truly invalid, that is where you go. That is all the law that you have left.

CP at 38.

¶53 While the trial court did mention a possible windfall, it also noted the authority that would support such a remedy if the ordinances were invalid, which we hold they were. Thus, we hold that the City may not adopt a retroactive ordinance to recalculate the fee for Palermo; it must use ordinance 919 as it existed when Palermo began its development.

## V. PREJUDGMENT INTEREST

¶54 Palermo next contends that the trial court erred by denying it prejudgment interest on remand.

Prejudgment interest is allowed in civil litigation at the statutory judgment interest rate, RCW 4.56.110, RCW 19.52-.020, when a party to the litigation retains funds rightfully belonging to another and the amount of the funds at issue is liquidated, that is, the amount at issue can be calculated with precision and without reliance on opinion or discretion. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 33, 442 P.2d 621 (1968).

. . . The touchstone for an award of prejudgment interest is that a party must have the "use value" of the money improperly. *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986). In effect, an award of prejudgment interest compels a party that wrongfully holds money to disgorge the benefit.

*Mahler v. Szucs*, 135 Wn.2d 398, 429-30, 957 P.2d 632 (1998).

¶55 Palermo contends that when a city collects a fee under an invalid ordinance, the plaintiff is entitled not only to a refund of the illegally collected amount, but also to prejudgment interest from the date of payment. Palermo cites *Swartout v. City of Spokane*, 21 Wn. App. 665, 676, 586 P.2d 135 (1978), *review denied*, 91 Wn.2d 1023 (1979), in support of its contention.

¶56 In *Swartout*, Division Three of this court held void an ordinance that the city of Spokane enacted because the city there failed to follow its own procedural requirements and because the city included an improper emergency provision that made the ordinance effective immediately. *Swartout*, 21 Wn. App. at 673-74. A local cardroom owner challenged the ordinance, which enacted a tax on social card games, as invalid. *Swartout*, 21 Wn. App. at 666. The cardroom owner paid the taxes and then sued for a refund, which Division Three granted. *Swartout*, 21 Wn. App. at 668, 673.

¶57 The *Swartout* court addressed whether the cardroom owner was entitled to interest on the amount that he had paid for the invalid tax. 21 Wn. App. at 676. Division Three cited *Doric Co. v. King County*, 59 Wn.2d 741, 370 P.2d 254 (1962), as follows:

> In *Doric*, a refund of real estate excise taxes was allowed, together with interest from the date of payment. The court summarily affirmed the granting of interest by reference to a number of prior cases in which interest was allowed. This case is dispositive of the issue here and, accordingly, the trial court erred in denying interest.

*Swartout*, 21 Wn. App. at 676.

¶58 In *Henderson Homes, Inc. v. City of Bothell*, 124 Wn.2d 240, 252, 877 P.2d 176 (1994), our Supreme Court allowed prejudgment interest for the plaintiff after finding void the impact fees developers paid. *See also Carrillo v. City of Ocean Shores*, 122 Wn. App. 592, 616-17, 94 P.3d 961 (2004) (allowing interest when this court held availability charges for water and sewer illegal).

¶59 The City counters that Palermo's claim is not liquidated. It contends that for the sum to be considered liquidated, the amount must be clear before trial, not after trial. But the City offers no authority in support of this assertion.

¶60 The City bases the assertion that Palermo's claim is not liquidated on the fact that the trial court ordered the

City to *reimburse* Palermo a sum consistent with its ruling once the City adopts a new ordinance. Clearly, the trial court tied the remedy that it granted Palermo to the new ordinance that it enjoined the City to adopt. Accordingly, the amount of the SDC under the new ordinance would not have existed until the City adopted it. Under this methodology, Palermo's claim probably would not be considered liquidated.

¶61 But, we hold that the remedy the trial court provided requiring the *reimbursement* was in error. Palermo did not request a reimbursement as it relates to a new ordinance but, rather, sued for a refund and a declaratory judgment that the challenged ordinances were void.

¶62 Our role is to determine whether the adoption of the SDC is arbitrary and capricious. *Teter*, 104 Wn.2d at 234. Accordingly, we follow *Swartout*. We hold that Palermo's claim is liquidated, as it consists of the entire amount that it paid under the void ordinances and that any future SDC that Palermo will pay under ordinance 919 is not properly before us. Palermo is due the refund of the amount it overpaid. The trial court erred by denying Palermo prejudgment interest on the overpaid amount. We hold that Palermo is due prejudgment interest based on the difference between what it posted and what the appropriate charge is under ordinance 919. If the amount that the City determines Palermo owes under ordinance 919 is less than the amount it has already paid, we hold that the trial court must determine the difference and order the City to pay prejudgment interest to Palermo on that amount.

## VI. Parties Not before the Trial Court

¶63 Without argument or explanation, the trial court enjoined the City on remand to include in its new ordinance that it will pay refunds to all persons that paid SDCs under ordinances 1100, 1192, and 1220. The City argues that the trial court erred by creating this requirement because none of those persons are before this court. It

cites to *In re Marriage of McKean*, 110 Wn. App. 191, 195, 38 P.3d 1053 (2002), for the proposition that a "trial court does not have authority to adjudicate the rights of parties not before the court." Br. of Appellant at 32. Instead, the City contends that the trial court's remedy would apply only if the trial court had certified a class of plaintiffs under CR 23, which it did not do in this case. The City is correct.

¶64 As mentioned earlier, we are not requiring the City to develop lower charges necessarily but, rather, to follow the instructions the legislature provided in RCW 35.92.025. Accordingly, it was error for the trial court to require the City to provide refunds per se, because that order implicitly requires that the City lower its SDC.

## VII. ATTORNEY FEES FROM THE COMMON FUND

¶65 The trial court granted reasonable attorney fees to Palermo under the common fund doctrine, apparently from a fund that the City would establish to hold the difference between the amount people paid under ordinances 1100, 1192, and 1220, and the amount that the trial court instructed the City to adopt on remand. Palermo first contends that the common fund is the appropriate solution based on the trial court's instructions. But, as we indicated above, that remedy was erroneous. Accordingly, Palermo's claim fails.

¶66 Palermo next contends that common funds are appropriate even outside of class action suits, citing cases that provide a common fund for the benefit of other parties besides the prevailing litigant. Palermo cites *Hamm v. State Farm Mutual Automobile Insurance Co.*, 151 Wn.2d 303, 318-20, 88 P.3d 395 (2004), where our Supreme Court dealt with the common fund doctrine in a case not involving a class action suit.

¶67 The common fund doctrine is an exception to the "American Rule" on fees in civil cases. *Hamm*, 151 Wn.2d at 310. The *Hamm* court cited to *Mahler* to clarify that the doctrine applies in cases where litigants preserve or create

a common fund for the benefit of others as well as themselves. *Hamm*, 151 Wn.2d at 310. *Hamm* involved the rule that insurance carriers can seek reimbursement once the insured is fully compensated, so long as the carrier pays a pro rata share of the legal expenses the insured incurred to create the fund. *Hamm*, 151 Wn.2d at 310. It is unclear how this would support Palermo's argument since neither of the litigants here preserved or created a common fund. None of the other cases Palermo cites appear applicable to this case.

¶68 We do not sustain a trial court's award of attorney fees unless they are specifically authorized by statute. *Swartout*, 21 Wn. App. at 676. Palermo fails to provide us with a statute authorizing attorney fees in this case. We reverse the trial court's award of common fund attorney fees to Palermo.

## VIII. ATTORNEY FEES

¶69 Palermo requests fees on appeal under RAP 18.1. It adopts its common fund doctrine argument in support of this request. We deny Palermo's request for the reasons mentioned above.

¶70 In conclusion, we affirm the trial court's decision that the City arbitrarily adopted its ordinances, and thus the ordinances were unreasonable and void. We order the City to calculate Palermo's SDC under ordinance 919. If the City determines that Palermo overpaid under ordinance 919, we require the City to refund Palermo's overpayment with prejudgment interest. We vacate the trial court's requirements regarding what numbers the City must constrain itself to follow and instruct the City that it cannot rely on Mr. Cebron's analysis to calculate the amount of the connection fee under ordinance 919. We vacate the trial court's award of attorney fees under the inapplicable common fund doctrine. We also vacate the trial court's requirement that the City provide refunds to all persons that paid SDCs under ordinances 1100, 1192, and 1220.

VAN DEREN, C.J., and QUINN-BRINTNALL, J., concur.

Review denied at 166 Wn.2d 1003 (2009).