# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WESTRIDGE-ISSAQUAH II LP and POLYGON WLH LLC, Washington companies,<br><br>      Respondents,<br><br>    v.<br><br>CITY OF ISSAQUAH, a municipal corporation,<br><br>      Appellant. | DIVISION ONE<br><br>No. 82025-7-I<br><br>PUBLISHED OPINION |

DWYER, J. — The City of Issaquah (the City) appeals from the superior court's order granting the petition filed pursuant to the Land Use Petition Act (LUPA)[1] by Westridge-Issaquah II LP and Polygon WLH LLC (collectively Polygon). In its petition, Polygon claimed that the City illegally imposed certain general facility charges (GFCs) on several of its properties. Polygon contends that it had a vested right to have lower GFCs imposed on its properties pursuant to an expired development agreement. Additionally, Polygon asserts that the City's imposition of the higher GFCs violated RCW 35.92.025—a statute requiring utility connection charges to be reasonable such that they are based on property owners' equitable shares in the cost of the city utility systems.

Both because Washington's vesting doctrine does not apply to fees and because Polygon did not adduce any evidence challenging the basis on which

---

[1] Ch. 36.70C RCW.

the City's ordinances established the disputed GFCs, we reverse the trial court's order insofar as it requires the City to refund the GFCs that were imposed on Polygon's properties and to assess GFCs for future building permits submitted by Polygon according to the development agreement. In an order that is not the subject of an assignment of error, the trial court varied the amount that the City is authorized to charge Polygon for side-sewer fees and water-meter installation fees. We leave that order undisturbed, thereby affirming it.

I

Polygon owns land in an area of the City known as the Issaquah Highlands. Polygon intends to construct numerous single-family residential units and townhomes in the Issaquah Highlands. One of Polygon's development projects is known as the Westridge Single-Family North development, which is a 73-unit single-family subdivision located within the northern portion of Polygon's property.

In June 1996, the City entered into a development agreement with Grand Ridge LP and Glacier Ridge LP (the Partnership). Under this agreement, the Partnership designated Port Blakely Communities, Inc. as their "agent with authority to give notices, approvals and otherwise act pursuant to [the] Agreement." The parties agree that Port Blakely was Polygon's predecessor in interest.

The development agreement contained various "development standards," which controlled aspects of development in the Issaquah Highlands. Under the development agreement, the Partnership was to construct water and sewer

facilities to serve development in the Issaquah Highlands.[2] According to a memorandum dated December 16, 2013, and authored by a city official, Port Blakely constructed water, sewer, and stormwater systems in the Issaquah Highlands that were "designed to support the planned development needs in the project."

In exchange for Port Blakely's construction of these facilities, the City agreed to consider to amend its ordinances imposing water and sewer GFCs on properties that fell within the scope of the agreement.[3] The development agreement did not contain any such provisions with regard to stormwater GFCs.

Notably, the development agreement provided that "[t]he parties agree to take further actions and execute further documents, either jointly or within their

---

[2] With regard to water facilities, section 3.12 of the development agreement stated, in part:

> The Partnership shall provide at its cost water facilities and incorporate water conservation measures to serve the [urban growth area] consistent with the "Grand Ridge Water Service" document, which is set forth in Appendix F. The City shall provide water to the [urban growth area] Portion of the Project sufficient for the Allowable Development.

With regard to sewer facilities, section 3.13 of the development agreement stated, in part:

> The Partnership shall provide at its cost sewer facilities to serve the [urban growth area] consistent with the "Grand Ridge Sewer Service" document, which is set forth in Appendix G.

[3] Under Appendix F, the City agreed to consider to amend its ordinance imposing a water GFC on the Highlands:

> In recognition of the Partnership's obligation to provide the Grand Ridge water system through a series of water main extensions, pump stations and water reservoirs, the City agrees to consider adoption of amendments no later than August 4, 1996, to its current ordinance(s) which would authorize the City's normal connection (hook-up) fee to be adjusted so the Partnership pays its fair share of the portion of the water supply system attributable to Grand Ridge.

Under Appendix G, the City also agreed to consider to amend its ordinance imposing a sewer GFC on the Highlands:

> The sewer system shall be designed and constructed to city standards and become part of the City's system upon completion. In recognition that the Grand Ridge sewer system will be installed at the Partnership's cost . . . and will connect directly to the existing METRO GILMAN Interceptor, the City agrees to consider adoption of amendments, no later than August 4, 1996, to its current ordinances to authorize the Partnership to not pay any connection (hook-up) fee to the City.

respective powers and authority, to implement the intent of this Agreement."

During the term of the agreement, Port Blakely and the City executed several documents which waived or lowered the GFCs that applied to the developments in the Issaquah Highlands. Ultimately, the City agreed to (1) waive the GFCs imposed on single-family residences seeking to connect to the City's water and stormwater systems, and (2) impose a GFC of $165.06 on single-family residences seeking to connect to the City's sewer system.

The development agreement also set forth a build-out period of 20 years, during which the development standards contained within the agreement governed all development:

> All development within the [urban growth area] shall be governed by the Development Standards and shall be implemented through plats, short plats, binding site plans, site development permits, building permits and other permits and approvals ("Implementing Approvals") issued by the City. A "Buildout Period" of twenty (20) years following first final plat approval is established for the development and construction of uses for the Grand Ridge Project. During the Buildout Period, the City shall not modify or impose new or additional Development Standards beyond those set forth in this Agreement.

The development agreement further stated that "[t]he term of this Agreement shall continue at a minimum through the Buildout Period, and shall continue after the Buildout Period unless and until either the City or the Partnership . . . gives notice of termination."

On November 1, 2016, Port Blakely sent a letter to the City's mayor, land development manager, and economic development director in which it provided notice to terminate the development agreement.

After receiving the notice of termination from Port Blakely, the City was required, under the development agreement, to adopt replacement zoning and related development standards that would govern development in the area that was subject to the agreement:

> No sooner than six (6) months after the notice of termination, the City shall hold public hearings and shall adopt zoning and related development standards for the [urban growth area] portion of the Property, or portions thereof as determined appropriate by the City. Upon such adoption, this Agreement shall terminate and thereafter the [urban growth area] portion of the Property shall be governed by the adopted City zoning and related development regulations.

On March 19, 2018, the Issaquah city council passed ordinance 2830, which, among other things, terminated the development agreement and required single-family residences in the Issaquah Highlands to pay the $6,029 city-wide GFC to connect to the City's water utility system. Issaquah Ordinance 2830 (Mar. 19, 2018). Ordinance 2830 also provided that "all property formerly governed by [the] Development Agreement shall . . . be governed by the Urban Village Replacement Regulations adopted by this ordinance and other applicable City zoning and related development regulations." Issaquah Ordinance 2830 (Mar. 19, 2018).

On July 14, 2017, before the City terminated the development agreement, Polygon submitted a preliminary plat application to subdivide the Westridge Single Family North development into 73 single-family lots. On May 4, 2018, the chair of the City's Urban Village Development Commission sent a letter to the city

5

council recommending that it approve the preliminary plat application. The city council subsequently approved the preliminary plat application.[4]

After the development agreement was terminated, Polygon submitted building permit applications in which it sought to connect several single-family properties to the City's utility systems.[5] In September 2019, the City issued several invoices for development fees and charges associated with building permits for these properties. For each building permit, these invoices imposed various fees and charges, including a water GFC of $6,029, a sewer GFC of $2,024, and a stormwater GFC of $1,256.[6] Polygon paid these fees and charges under protest.

---

[4] The record does not contain the city council's approval of the preliminary plat application. However, in its opening brief, the City states that "[t]he Issaquah City Council approved Westridge's preliminary plat on July 16, 2018." Br. of Appellant at 17. Additionally, in its response brief, Polygon states that "[t]he City approved the Westridge North preliminary plat." Br. of Resp't at 13.

[5] The record does not contain Polygon's building permit applications. However, the parties agree that Polygon submitted its building permit applications after the development agreement was terminated. In its opening brief, the City states that "Polygon applied for its utility connections (via building permits) after termination of the Development Agreement." Br. of Appellant at 28. Likewise, in its response brief, Polygon states that "the building permits for plats approved under the Development Agreement were not all applied for prior to the Agreement's termination." Br. of Resp't at 38.

Moreover, the record indicates that Polygon sought to connect to the City's utility systems in its building permit applications. The Issaquah Municipal Code requires utility system connection charges to be assessed when the City issues the permit to connect to the utility system. IMC 13.24.090E; IMC 13.70.020B; IMC 13.30.055A. Here, the City assessed the utility connection charges upon issuance of Polygon's building permits.

[6] Approximately two years before the Issaquah city council terminated the development agreement, the city council passed two ordinances that established the sewer and stormwater GFCs that were ultimately imposed on Polygon's properties. The first, ordinance 2748, required a GFC of $2,024 to connect to the City's sewer system. Issaquah Ordinance 2748 (Nov. 2, 2015). The second, ordinance 2749, required a GFC of $1,256 to connect to the City's stormwater system. Issaquah Ordinance 2749 (Nov. 2, 2015). These ordinances specified that the effective date for these GFCs was January 1, 2016. Issaquah Ordinance 2748, 2749. Neither party cites to these ordinances, and they are not contained within the record on appeal. However, these ordinances may be found at https://issaquah.civicweb.net/filepro/documents/3338 [https://perma.cc/M978-5ZWA (2748); https://perma.cc/TAL3-W4TL (2749)].

Polygon then appealed the City's imposition of the fees and charges associated with three building permits to the Issaquah hearing examiner. The hearing examiner dismissed Polygon's appeal, reasoning that the Issaquah Municipal Code did not provide a procedural mechanism to appeal the fees and charges that were imposed on Polygon's properties.

In October and November 2019, the City issued several additional invoices for development fees and charges associated with building permits for properties located within the Westridge Single-Family North development. As with the previous invoices, these invoices assessed the GFCs according to the City's ordinances rather than the development agreement.

On October 17, 2019, Polygon filed a LUPA petition in the King County Superior Court. Polygon asserted that the City lacked the authority to impose various fees and charges, including (1) the water, sewer, and stormwater GFCs, and (2) a water-meter installation fee and side-sewer fee. In response, the City conceded that it improperly assessed the water-meter installation fee and side-sewer fee. However, the City maintained that it properly assessed the water, sewer, and stormwater GFCs that were imposed on Polygon's properties.

On October 2, 2020, the superior court entered an order granting Polygon's LUPA petition. The order required the City to "refund the water, and stormwater general facilities charges assessed against the Westridge North single family building permits" and "refund the sewer general facility charge except for $165.06." Additionally, the order required the City to "assess fees for all future single-family home building permits in the Westridge North subdivision

based on the Development Agreement GFCs." Finally, the order required the City to refund the water-meter installation fee and the side-sewer fee, as agreed to by the parties.

The City appeals.

II

A party seeking relief from a land use decision must file a petition in the superior court pursuant to LUPA. RCW 36.70C.040(1). "A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final determination."[7] HJS Dev., Inc. v. Pierce County, 148 Wn.2d 451, 467, 61 P.3d 1141 (2003).

"'When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court.'" HJS Dev., 148 Wn.2d at 468 (quoting Citizens to Pres. Pioneer Park, LLC v. City of Mercer Island, 106 Wn. App. 461, 470, 24 P.3d 1079 (2001)). Moreover, "[o]n appeal, the party who filed the LUPA petition bears the burden of establishing one of the errors set forth in RCW 36.70C.130(1), even if that party prevailed on its LUPA claim at the superior court." Quality Rock Prods., Inc. v. Thurston County, 139 Wn. App. 125, 134, 159 P.3d 1 (2007).

Under RCW 36.70C.130(1), a challenged decision violates LUPA if:

---

[7] Polygon contends that the City's building official was the officer with the highest level of authority to make the final determination regarding the GFCs that were imposed on Polygon's properties. The building official is "[t]he officer or other designated authority charged with the administration and enforcement of the Uniform Building Code and assigned provisions of this [Land Use] Code." IMC 18.02.040. However, under the Issaquah Municipal Code, it is the city engineer, not the building official, who is authorized to administer the sections of the code regarding water, sewer, and stormwater GFCs. IMC 13.04.010A; IMC 13.32.010.

          (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
          (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
          (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
          (d) The land use decision is a clearly erroneous application of the law to the facts;
          (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
          (f) The land use decision violates the constitutional rights of the party seeking relief.

Polygon asserts that the City violated RCW 36.70C.130(1)(b) and (d) by imposing the higher GFCs on its properties.[8]  We review de novo whether a decision is based on an erroneous interpretation of the law under subsection (b). Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011).  Additionally, "[a] finding is clearly erroneous under subsection (d) when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." Phoenix Dev., 171 Wn.2d at 829.

III

Polygon contends that it had a vested right to have the GFCs imposed on its properties assessed according to the development agreement.  This is so, Polygon avers, because it submitted its preliminary plat application before the development agreement was terminated.  We disagree.

---

[8] Polygon also states that RCW 36.70C.130(1)(c) is "applicable" to this case.  Br. of Resp't at 18.  However, Polygon concedes that, because the City's assessment of the disputed GFCs did not involve findings of fact, "there are no factual findings for this Court to review under the substantial evidence standard."  Br. of Resp't at 19-20.

9

A

"In Washington, 'vesting' refers generally to the notion that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the application's submission." Noble Manor Co. v. Pierce County, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997). "At common law, this state's doctrine of vested rights entitled developers to have a land development proposal processed under the regulations in effect at the time a complete *building permit* application was filed." Noble Manor, 133 Wn.2d at 275. "In 1987, the Legislature (1) codified the traditional common law vested rights doctrine regarding vesting upon application of building permits [in RCW 19.27.095], and (2) enlarged the vesting doctrine to also apply to subdivision and short subdivision applications [in RCW 58.17.033]." Noble Manor, 133 Wn.2d at 275 (citing LAWS OF 1987, ch. 104; Friends of the Law v. King County, 123 Wn.2d 518, 522, 869 P.2d 1056 (1994)).

"The purpose of the vested rights doctrine is to provide a measure of certainty to developers and to protect their expectations against fluctuating land use policy." Noble Manor, 133 Wn.2d at 278. However, "[i]f a vested right is too easily granted, the public interest is subverted." Noble Manor, 133 Wn.2d at 280. This is because "development interests protected by the vested rights doctrine come at a cost to the public interest because the practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use." Noble Manor, 133 Wn.2d at 280.

B

A developer may also have a right to have certain standards imposed on its development pursuant to a development agreement. Under RCW 36.70B.170(1), "[a] local government may enter into a development agreement with a person having ownership or control of real property within its jurisdiction." Significantly, the development standards contained within a development agreement govern only during the term or build-out period specified in the agreement:

> Unless amended or terminated, a development agreement is enforceable *during its term* by a party to the agreement. A development agreement and the development standards in the agreement govern *during the term of the agreement, or for all or that part of the build-out period specified in the agreement*, and may not be subject to an amendment to a zoning ordinance or development standard or regulation or a new zoning ordinance or development standard or regulation adopted after the effective date of the agreement. A permit or approval issued by the county or city after the execution of the development agreement must be consistent with the development agreement.

RCW 36.70B.180 (emphasis added).

The development agreement herein, which was entered into in June 1996, established a build-out period of 20 years:

> A "Buildout Period" of twenty (20) years following first final plat approval is established for the development and construction of uses for the Grand Ridge Project. During the Buildout Period, the City shall not modify or impose new or additional Development Standards beyond those set forth in this Agreement.

This agreement specified that, upon expiration of the build-out period, either party could give notice to terminate the agreement. On November 1, 2016,

11

Port Blakely sent a letter to City officials in which it provided notice to terminate the development agreement.

Upon receiving the notice of termination from Port Blakely, the City was required, under the development agreement, to adopt zoning and related development standards that would govern development in the area that was subject to the agreement:

> No sooner than six (6) months after the notice of termination, the City shall hold public hearings and shall adopt zoning and related development standards for the [urban growth area] portion of the Property, or portions thereof as determined appropriate by the City. Upon such adoption, this Agreement shall terminate and thereafter the [urban growth area] portion of the Property shall be governed by the adopted City zoning and related development regulations.

On March 19, 2018, the City passed ordinance 2830, which, among other things, terminated the development agreement and required properties that were subject to the agreement to be "governed by the Urban Village Replacement Regulations adopted by this ordinance and other applicable City zoning and related development regulations." Issaquah Ordinance 2830 (Mar. 19, 2018).

C

Polygon asserts that, because it submitted a preliminary plat application before the development agreement was terminated, it had a vested right to have the GFCs provided in the agreement imposed on its development until approval of its preliminary plat expires.[9] This is so, Polygon avers, because the preliminary plat application specified that the development was for single-family

---

[9] Under the Issaquah Municipal Code, "[a]pproval of any preliminary plat shall expire and the preliminary plat shall be considered withdrawn seven (7) years from the date of such preliminary plat approval." IMC 18.13.170A.

12

use. Therefore, according to Polygon, the GFCs agreed to under the development agreement—which applied to properties for single-family use—governed the processing of its building permit applications, which were submitted after the development agreement was terminated. Polygon's argument fails for three reasons.

1

First, the vesting statute for preliminary plat applications, RCW 58.17.033, does not apply to fees. This statute provides:

> A proposed division of land, as defined in RCW 58.17.020, shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.

RCW 58.17.033(1).

In New Castle Investments v. City of LaCenter, 98 Wn. App. 224, 226, 989 P.2d 569 (1999), the court held that RCW 58.17.033 "does not apply to transportation impact fees (TIFs) because they do not fall within the definition of 'land use control ordinances.'" The court therein reasoned that a transportation impact fee did not qualify as a "land use control ordinance" because it neither limited the use of land nor resembled a zoning law:

> The right that vests, according to Noble Manor, is "the right to have the uses disclosed in [the applicant's] application considered by the county or local government under the laws in existence at the time of the application." 133 Wn.2d at 283. According to legal commentators, "[t]he vested rights rule is generally limited to those laws which can loosely be considered 'zoning' laws." WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESK BOOK, § 97.8(2)(d) (3rd ed. 1996). A TIF does not

limit the use of land, nor does it resemble a zoning law. Instead, a
TIF merely affects the ultimate cost of the development. Thus, it
is not the type of right that vests under the vested rights doctrine.

New Castle Invs., 98 Wn. App. at 232.

Similarly, in Lincoln Shiloh Associates, Ltd. v. Mukilteo Water District, 45

Wn. App. 123, 128, 724 P.2d 1083, 742 P.2d 177 (1986), we explained that "it is

inappropriate to apply the vesting doctrine to fees." A property owner therein

"submitted to the [Mukilteo Water] District an application for permission to extend

[a] water main." Lincoln Shiloh Assocs., 45 Wn. App. at 126. After the district

approved the application, it adopted a resolution that imposed a GFC for

connecting to the district's water facility and increased the property owner's cost

to connect from $6,400 to $95,680. Lincoln Shiloh Assocs., 45 Wn. App. at 126.

After the connection charge was increased, the property owner applied to

connect to the district's water facility and paid the increased connection charge

under protest. Lincoln Shiloh Assocs., 45 Wn. App. at 126. We rejected the

property owner's argument that it had a vested right to the connection charge in

effect when its application to extend the water main was approved:

> [The property owner] is not being forced to use its land or build
> differently from that which [the property owner] was able to do at
> the time its plans were approved by the District. Instead, the cost is
> increased. [The property owner] had no more than an expectation
> that the connecting charges would remain $6,400. There is no
> vested right here to the connection fee remaining $6,400.

Lincoln Shiloh Assocs., 45 Wn. App. at 128-29.

The water, sewer, and stormwater GFCs imposed on Polygon's properties

did not limit Polygon's use of the properties or the development thereon. In other

words, the water, sewer, and stormwater GFCs were not "land use control

ordinances" under RCW 58.17.033(1). Accordingly, Polygon did not have a vested right to have the GFCs that were imposed on its properties assessed pursuant to the development agreement.

2

Polygon's argument fails for another reason, as well. Despite its claim to the contrary, Polygon did not have a right to have its building permit applications vest to the land use laws in effect when it submitted its preliminary plat application. Our Supreme Court has clarified which rights vest upon the submission of a complete preliminary plat application:

> Not all conceivable uses allowed by the laws in effect at the time of a short plat application are vested development rights of the applicant. However, when a developer makes an application for a *specific use*, then the applicant has a right to have *that application* considered under the zoning and land use laws existing at the time the completed plat application is submitted.

Noble Manor, 133 Wn.2d at 285 (emphasis added).

Stated differently, upon submission of a preliminary plat application, an applicant has a right to have the specific uses sought in the application considered under the land use laws in effect when the application was submitted. Additionally, an applicant has the right to have only the preliminary plat application—not a subsequently filed building permit application—considered under the land use laws in effect when the preliminary plat application was submitted.

Polygon did not seek to connect to the City's water, sewer, or stormwater systems in its preliminary plat application. Rather, Polygon sought to connect to these utility systems in its building permit applications, which were filed after the

15

development agreement was terminated. It is of no significance that Polygon specified in its preliminary plat application that it sought to develop single-family residences—Polygon had a vested right to have only its *preliminary plat application* considered under the land use laws in effect when that application was submitted.

Polygon cites to Association of Rural Residents v. Kitsap County, 141 Wn.2d 185, 4 P.3d 115 (2000), and Schneider Homes, Inc. v. City of Kent, 87 Wn. App. 774, 942 P.2d 1096, 971 P.2d 56 (1997), in support of its argument that, because its preliminary plat application specified that the development was for single-family use, its subsequently-filed building permit applications vested to the development standards contained within the development agreement. However, these cases do not support Polygon's argument.

In Schneider Homes, we held that a developer had a right to have both its preliminary plat application and a "companion" planned unit development permit application vest to the ordinances in effect when those applications were submitted. 87 Wn. App. at 779. We reasoned that the preliminary plat application was "inextricably linked" to the planned unit development application such that the preliminary plat application could not "go forward without" the planned unit development application. Schneider Homes, 87 Wn. App. at 778. In Association of Rural Residents, our Supreme Court relied on our reasoning in Schneider Homes and held that, "when a preliminary plat application is coupled with a [planned unit development] proposal, the [planned unit development]

16

ordinance is one of the laws in effect at the time of application to which the vested rights doctrine applies." 141 Wn.2d at 195.

Polygon's building permit applications were not "inextricably linked" to its preliminary plat application such that the preliminary plat application could not be approved unless the building permit application was also approved. Indeed, the Issaquah Municipal Code generally requires preliminary plat applications to be approved before a party may submit a building permit application: "All development proposals . . . are subject to Project Permit[10] approval prior to Building Permit application unless otherwise allowed by the Building Official." IMC 18.04.090. Thus, Polygon did not have a right to have its building permit applications vest to the land use laws in effect when it submitted its preliminary plat application.[11]

---

[10] The term "Project Permit" is defined to include "subdivisions." IMC 18.02.180.

[11] Polygon also asserts that various assurances made by the City demonstrate that it had a vested right to the GFCs agreed to under the development agreement. However, mere assurances from city officials do not grant a party vested rights. Deer Creek Developers, LLC v. Spokane County, 157 Wn. App. 1, 12-13, 236 P.3d 906 (2010). In any event, none of the documents cited by Polygon indicate that the City assured Polygon that it had a vested right to the GFCs agreed to under the development agreement.

First, Polygon cites to an e-mail message from a City official explaining that the GFCs imposed on single-family residences seeking to connect to the City's (1) water and stormwater systems would amount to $0, and (2) sewer system would amount to $165.06. However, this e-mail message was sent to Polygon on March 10, 2017—approximately one year before the city council terminated the development agreement. Additionally, this e-mail message was a response to an e-mail message sent by an employee of Polygon that requested the City to "confirm what we will pay . . . under the Developer Agreement." Plainly, in this message, the City did not assure Polygon that these GFCs would apply after the development agreement was terminated.

Second, Polygon cites to a March 2017 letter from the City's director of the Department of Development Services which merely explained that, when a complete "application" is submitted, *that application* vests to the zoning and development regulations in effect at that time:

> Requirements for a complete application necessary to vest are set forth by municipal code. IMC 18.01.050(C)(1) sets forth the requirements for a complete application. When an application is submitted meeting those requirements, *the application is vested* and would be unaffected by any future changes in zoning or development regulations so long at the application remains active (IMC.18.04.220.D.2). This would, [sic] include any changes as a result of termination of the Issaquah Highlands Development Agreement.

17

3

Finally, Polygon's argument fails for a third reason. Polygon did not have a vested right to have the GFCs assessed at any particular amount until it both applied to connect to the City's utility systems and paid the applicable fees. In Irvin Water Dist. No. 6 v. Jackson Partnership, 109 Wn. App. 113, 122, 34 P.3d 840 (2001), the court concluded that the developers therein "did not have a vested right in any particular fee schedule, at least before application and payment of the applicable connection fees." This was so because application to connect to the district's utility system and payment of the applicable connection fees were both "required by District regulations and bylaws to secure service." Irvin Water Dist., 109 Wn. App. at 118. Likewise, the Issaquah Municipal Code requires property owners to both apply to connect to the City's utility systems and pay the applicable connection charges in order to secure service.[12] And here,

_____

(Emphasis added.)

This letter did not provide that Polygon had a vested right to have the GFCs agreed to under the development agreement imposed on its properties.

Finally, Polygon cites to a November 2017 memorandum which regarded a proposal to extend vesting rights to administrative site development permits and site development permits following the termination of the development agreement. However, the memorandum did not state that building permit applications submitted after the development agreement was terminated would be processed according to the development agreement.

[12] With regard to applications for water service, the Issaquah Municipal Code provides: "The owner of any property who desires to connect to the City Water System shall make application for the connection on the standard form for water service and at that time, he shall pay all connection charges, fees, or assessments required by the Water System Code." IMC 13.04.020. Additionally, the code provides that "there is imposed upon the owners of property seeking to provide water service to their property by connecting to the City's water system a general facility charge." IMC 13.24.090. Next, with regard to the City's sewer system, the code provides: "The general facility charge shall be paid and collected at the time of permit issuance for a sewer connection and prior to actual connection." IMC 13.70.020B. Finally, with regard to City's stormwater system, the code provides: "[T]here is imposed upon the owner of property seeking to connect to the City's stormwater system a general facility charge," and that "[t]he general facility charge shall be paid and collected at the time of permit issuance for development and prior to actual development." IMC 13.30.055A-B.

18

Polygon applied to connect to the City's utility systems and paid the connection charges *after* the development agreement was terminated.

Accordingly, Polygon did not have a vested right to have the GFCs imposed on its properties assessed pursuant to the development agreement.

IV

Polygon next contends that the City's imposition of the higher water, sewer, and stormwater GFCs violated RCW 35.92.025.[13]  Specifically, Polygon asserts that these charges were not reasonable because the impacts of the Westridge Single-Family North development on the City's utility systems were already "fully mitigated" under the development agreement.  Because RCW 35.92.025 does not permit the sort of individualized challenge advanced by Polygon, this claim also fails.

RCW 35.92.025 authorizes cities to assess charges to property owners seeking to connect to city utility systems.  This statute provides, in pertinent part:

> Cities and towns are authorized to charge property owners seeking to connect to the water or sewerage[14] system of the city or town as a condition to granting the right to so connect, in addition to the cost of such connection, such reasonable connection charge as the legislative body of the city or town shall determine proper in order

---

[13] Under the Issaquah Municipal Code, the City of Issaquah elected to be classified as a noncharter code city: "The classification of 'non-charter code city' is adopted for the City of Issaquah in lieu of its present classification as a municipal corporation of the third class."  IMC 1.08.010.  Cities that elect to be classified as noncharter code cities are "governed according to the provisions of [Title 35A] under one of the optional forms of government provided for noncharter code cities."  RCW 35A.01.020.  Under Title 35A, "[a] code city may protect and operate utility services as authorized by chapters 35.88, 35.91, 35.92, and 35.94 RCW."  RCW 35A.80.010.  "The term 'code city' means any noncharter code city or charter code city."  RCW 35A.01.035.  Accordingly, as a noncharter code city, the City was authorized to impose GFCs pursuant to RCW 35.92.025.

[14] Under chapter 35.92 RCW, "[a] city or town may . . . operate systems, plants, sites, or other facilities of sewerage as defined in RCW 35.67.010."  RCW 35.92.020(1).  The cited statute defines "system of sewerage" to include, among other things, "[c]ombined sanitary sewage disposal and storm or surface water sewers," "[s]torm or surface water sewers," and "[o]utfalls for storm drainage . . . and facilities for storm drainage."  RCW 35.67.010(2)-(4).

> that such property owners shall bear their equitable share of the cost of such system.

RCW 35.92.025.

The connection charges imposed on Polygon's properties were established pursuant to three city ordinances. First, ordinance 2748, which was passed in November 2015, stated with regard to the city-wide sewer GFC that "the general facility charge currently of $2,039 has not been evaluated since 2006 and it is determined the rate should decrease to $2,024." Issaquah Ordinance 2748 (Nov. 2, 2015). Next, ordinance 2749, which was also passed in November 2015, stated with regard to the city-wide stormwater GFC that "the current general facilities charge of $789.00 per equivalent service units (ESU) is increased to $1,256 to reflect the cost of service." Issaquah Ordinance 2749 (Nov. 2, 2015). Lastly, in March 2018, the city council passed ordinance 2830, which terminated the development agreement and required single-family residences in the Issaquah Highlands to be charged the city-wide water GFC of $6,029. Issaquah Ordinance 2830 (Mar. 18, 2018).

"We presume the validity of ordinances, but this presumption no longer exists when evidence discloses that the basis on which the ordinance establishes the fee is not the proper basis the statute authorized." Palermo at Lakeland, LLC v. City of Bonney Lake, 147 Wn. App. 64, 76, 193 P.3d 168 (2008) (citing Boe v. City of Seattle, 66 Wn.2d 152, 155, 401 P.2d 648 (1965)); accord Prisk v. City of Poulsbo, 46 Wn. App. 793, 804, 732 P.2d 1013 (1987) ("Connection fees established by ordinance are presumptively valid, and one who challenges them has the burden of proving that the charges are unreasonable." (citing Boe, 66

Wn.2d at 155)). Additionally, "[w]e will sustain a legislative determination if we can conceive of any state of facts that justify the determination." Palermo, 147 Wn. App. at 76.

Under RCW 35.92.025, "the only requirements placed on [cities] are that the charge is reasonable and that [cities] base[] these charges on the equitable cost of their [utility] system." Palermo, 147 Wn. App. at 79. Additionally, "'the fundamental basis on which the fee is to be calculated . . . is not that of the benefit received but merely an equitable sharing of the cost of the system.'" Boe, 66 Wn.2d at 156.

Polygon contends that the water, sewer, and stormwater GFCs imposed on its properties located within the Westridge Single-Family North development were not reasonable under RCW 35.92.025. This is so, Polygon argues, because the impacts of the Westridge Single-Family North development were "fully mitigated" under the development agreement.[15] However, Polygon does

---

[15] In support of its argument that the impacts of the Westridge Single-Family North development on the City's utility systems were "fully mitigated," Polygon cites to various documents. However, none of these documents demonstrate that Polygon had paid an equitable share in the cost of the city-wide utility systems. Rather, these documents provide merely that (1) the infrastructure in the Issaquah Highlands was adequate to support the needs of the development, and (2) the City utility systems had the capacity to support the needs of the development.

First, Polygon quotes the development agreement, which provides that "[t]he Partnership's compliance with the Development Standards and performance of its obligations contained in this Agreement . . . shall constitute the adequacy and sufficiency of public facilities and services for the Project." This language indicates only that Port Blakely's performance under the development agreement would allow the Issaquah Highlands to be adequately supported by public facilities. It does not indicate that Port Blakely had paid an equitable share of the cost of the city-wide utility systems.

Second, Polygon cites to two City memoranda, dated December 16, 2013, and February 26, 2015, which provided that adequate capacity existed in the City's water, sewer, and stormwater systems to support further development in the Issaquah Highlands. These memoranda did not provide that the Westridge Single-Family North development's impacts on the water, sewer, and stormwater systems were "fully mitigated" such that Polygon had paid an equitable share of the cost of these city-wide utility systems.

not attempt to demonstrate that the GFCs enacted pursuant to ordinances 2748, 2749, and 2830 were established on an improper basis.

Yet to successfully challenge GFCs enacted pursuant to RCW 35.92.025, a party must adduce "'evidence disclos[ing] that the basis on which *the ordinance* establishes the fee is not the proper basis authorized by the statue.'" Boe, 66 Wn.2d at 155 (emphasis added). The statute requires connection charges established by ordinance to be "reasonable" such that "property *owners* shall bear *their* equitable share of the cost of" the city's utility system. RCW 35.92.025 (emphasis added). This language contemplates the equitable share of property owners as a class, not what is equitable to charge an individual property owner based on that particular owner's impact on the city utility system.

This reading of the statute is supported by the fact that "adopting a fee ordinance for [connection charges] is a purely legislative function under RCW 35.92.025." Palermo, 147 Wn. App. at 84-85. Indeed, "area-wide actions, such as the adoption of comprehensive plans and zoning ordinances, involving the

---

Third, Polygon cites to a letter from the chair of the City's Urban Village Development Commission recommending approval of Polygon's preliminary plat application. This letter provided that "[t]he development standards for storm water management and groundwater protection as set forth in Appendix D of the Development Agreement were used to evaluate the proposal. Appropriate measures for storm water management and groundwater will be provided." This letter also stated that "[t]he development standards for utilities as set forth in City standards were used to evaluate the proposal. The proposal, with the recommended conditions of approval, complies with the applicable standards." This letter does not provide that Polygon had already paid an equitable share of the cost of the city-wide utility systems.

Finally, Polygon cites to a letter from a City official commemorating Polygon's purchase of "storm water capacity" from the City for a fee of $181,095. According to a staff report from the City's Development Services Department, Polygon's payment of this fee "allow[ed] [Polygon] to contribute additional stormwater to the City's facilities." In its response brief, Polygon states that, "[w]ith respect to stormwater, the City assessed the adequacy of the facilities built by Port Blakely specifically for the Westridge North subdivision and found those sufficient once Polygon paid a supplemental $181,095 fee." Br. of Resp't at 26-27. Thus, Polygon's payment of this fee ensured that the facilities constructed by Port Blakely adequately served Polygon's development. It did not ensure that Polygon paid an equitable share of the cost of the city-wide stormwater system.

exercise of the legislative body's policy-making role, are generally considered legislative." Holbrook, Inc. v. Clark County, 112 Wn. App. 354, 365, 49 P.3d 142 (2002). Notably, "such actions are not made quasijudicial simply because they affect specific individuals." Holbrook, 112 Wn. App. at 365. "Although legislative decisions may appear adjudicatory when groups focus on how the particular decisions will affect their individual rights, all policy decisions begin with the consideration and balancing of individual rights." Raynes v. City of Leavenworth, 118 Wn.2d 237, 249, 821 P.2d 1204 (1992).

Because the City's adoption of the GFCs at issue was legislative, rather than adjudicatory, in nature, Polygon cannot challenge these GFCs under RCW 35.92.025 solely as they apply to its particular properties. After all, "'the fundamental basis on which the fee is to be calculated . . . is not that of the benefit received but merely an equitable sharing of the cost of the system.'" Boe, 66 Wn.2d at 156. Furthermore, the remedy when a party has established that connection charges enacted pursuant to RCW 35.92.025 are not reasonable is to invalidate the ordinance that enacted the connection charges, not to simply invalidate the charges as they apply to an individual property. See Boe, 66 Wn.2d at 156 ("'Under the evidence in this case, Ordinance No. 90233 Seattle Code No. 7.20.025 is unreasonable and therefore void.'"); Palermo, 147 Wn. App. at 68-69 ("We hold that the City arbitrarily adopted ordinance 1192 under which it assessed Palermo for connecting to the City's water system; thus, the ordinance was void, leaving the prior ordinance in effect.").

Polygon cites to RCW 82.02.020 in support of its argument that cities are limited in "charg[ing] a project only to the extent reasonably related to the impacts a project will have on the larger system."[16]  Under that statute, utility charges imposed by cities must generally be proportionate to a property's share of the utility system's cost:

> Nothing in this section prohibits counties, cities, or towns from imposing or permits counties, cities, or towns to impose water, sewer, natural gas, drainage utility, and drainage system charges. However, no such charge shall exceed the proportionate share of such utility or system's capital costs which the county, city, or town can demonstrate are attributable to the property being charged. Furthermore, these provisions may not be interpreted to expand or contract any existing authority of counties, cities, or towns to impose such charges.

RCW 82.02.020.

However, RCW 82.02.020 does not apply to connection charges established pursuant to RCW 35.92.025.  We say this because RCW 35.92.025 was enacted in 1965 and the language quoted above was amended to RCW 82.02.020 in 1982.  See LAWS OF 1965, ch. 7; LAWS OF 1982, 1st Ex. Sess., ch. 49, § 5.  In Prisk, for instance, two property owners asserted that connection charges enacted by the Poulsbo city council pursuant to RCW 35.92.025 violated the requirement set forth in RCW 82.02.020 that utility charges must be proportionate to a property's share of the utility system's cost.  46 Wn. App. at 803.  Division Two disagreed:

> [W]e hold that RCW 82.02.020 does not limit the City's authority to impose these connection charges.  That statute would require that utility charges be proportionate to the share of the utility's costs "attributable to the property being charged."  However, the statute has no application here as it specifically states that the existing

---

[16] Br. of Resp't at 23.

24

authority of cities to impose such charges remains unaffected by the statute. The City's existing authority is derived from RCW 35.92.025, which was enacted prior to RCW 82.02.020.

Prisk, 46 Wn. App. at 803.

Therefore, the City's water, sewer, and stormwater GFCs were not required, under RCW 82.02.020, to be proportionate to the share of the utility systems' costs attributable to Polygon's properties.

Polygon asserts that the City bore the burden to prove that the GFCs imposed on its properties were reasonable. In support of this argument, Polygon cites to Palermo, 147 Wn. App. 64. However, that opinion provides that the burden of proof shifts to a city only when a property owner adduces evidence demonstrating that the ordinance in dispute established a connection charge on an improper basis. See Palermo, 147 Wn. App. at 75, 84.

Indeed, a property owner in the Palermo dispute demonstrated that "the City adopted the ordinances based on outdated and incorrect numbers." 147 Wn. App. at 81. The city therein did not adduce any evidence based on data that was actually considered by the city when it adopted the charges at issue. Palermo, 147 Wn. App. at 83. Because the evidence that was adduced by the city was not based on data that was before the city when it adopted the ordinances at issue, the court held that the evidence that was presented by the city was "not relevant to [the] court's consideration." Palermo, 147 Wn. App. at 84. In light of the evidence that was adduced at trial, the court clarified that "the City still bears the burden of satisfying RCW 35.92.025 by providing reasonable

[charges] based on equitable shares of the cost of the system." Palermo, 147 Wn. App. at 84.

Polygon did not adduce any evidence challenging the method by which the City's ordinances established the GFCs at issue. For example, Polygon did not demonstrate that, in adopting these GFCs, the City excluded from its calculations properties that fell within the scope of the development agreement and that such exclusion unreasonably impacted the rate at which the GFCs were assessed against property owners city-wide. Because Polygon failed to satisfy its initial burden of proof, the burden never shifted to the City to prove that the GFCs were calculated on a proper basis.

Accordingly, Polygon fails to meet its burden to prove that the GFCs imposed by the City violate RCW 35.92.025. Additionally, under LUPA, the City's imposition of the disputed GFCs do not constitute an erroneous interpretation of law or a clearly erroneous application of law to the facts.

V

The superior court's order is reversed insofar as it requires the City to (1) refund the water, sewer, and stormwater GFCs that were imposed on Polygon's properties located within the Westridge Single-Family North development, and (2) assess GFCs for future building permits submitted by Polygon according to the development agreement. The order is affirmed insofar as it varies the amount that the City is authorized to charge Polygon for the side-sewer fees and water-meter installations fees that were imposed on its properties.

Affirmed in part, reversed in part.

WE CONCUR: