IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IHIF COMMERCIAL, LLC | ) | No. 83011-2-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CITY OF ISSAQUAH, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — IHIF Commercial appeals the dismissal of their petition for relief under the Land Use Petition Act (LUPA), arguing its permit applications vested pursuant to a development agreement with the City of Issaquah or alternatively under statute. Based on a plain reading of the agreement, Shelter's permit applications were vested. We reverse.

## FACTS

In 1996, the City of Issaquah (City) entered into a development agreement (DA) with various partnerships to develop a parcel known as the Issaquah Highlands. IHIF Commercial LLC, d/b/a Shelter Holdings (Shelter) owns 21.5 acres of land in this area. Shelter sought to subdivide the property for various commercial, retail, and residential development pursuant to the DA. It submitted

a preliminary plat application on August 1, 2017 and the City determined the application was complete on August 11, 2017. Over the next several months, Shelter submitted a site development permit (SDP) application and several administrative site development permit (ASDP) applications (collectively the SDPs) for a medical office building and a self-storage facility, but the City determined the initial submissions were incomplete and requested corrections and additional information. On March 15, 2018, the City and Shelter agreed all SDP applications were complete. Four days later, on March 19, 2018, the Issaquah City Council passed an ordinance terminating the DA and adopting new regulations governing the property.

The City informed Shelter that the new regulations did not recognize vesting under the DA and its pending SDP applications were now subject to new standards. While the zoning classifications did not change, the new regulations required Shelter to modify structural aspects of the project, such as parking and floor aspect ratios. Shelter declined to change its applications based on the DA. The SDPs were referred to the City Development Commission, which found the applications did not comply with the newly adopted regulations. Shelter appealed this determination to the City hearing examiner, who upheld the decision. Shelter then appealed the hearing examiner's decision to the King County Superior Court under LUPA. The court affirmed the hearing examiner's decision on a motion for partial summary judgment. The parties filed a joint motion to stay the remainder of the case and enter final judgment to allow Shelter to appeal the partial summary judgment order, which was granted.

ANALYSIS

I.    Land Use Petition Act and Standard of Review

We review a LUPA action under RCW 36.70C, standing "in the same position as the superior court when review[ing]" the record that was before the hearing examiner. Ellensburg Cement Products, Inc. v. Kittitas County, 179 Wn.2d 737, 742, 317 P.3d 1037 (2014). "Under LUPA, the petitioner carries the burden of establishing one of the standards set forth in RCW 36.70C.130(1)" as a basis for relief. Fuller Style, Inc. v. City of Seattle, 11 Wn. App. 2d 501, 507, 454 P.3d 883 (2019). If the land use decision is not supported by substantial evidence the petitioner is entitled to relief. RCW 36.70C.130(1)(c).

In a review for substantial evidence, "all facts and inferences" are construed "in a light most favorable to the party that prevailed in the highest fact-finding forum." Douglass Props. II, LLC v. City of Olympia, 16 Wn. App. 2d 158, 165, 479 P.3d 1200, review denied, 197 Wn.2d 1018 (2021), and cert. denied, 142 S. Ct. 900 (2022). Then we "determine whether sufficient evidence exists in the record to persuade a reasonable person of the truth asserted by the alleged facts." Id.

The City argues that deference is owed "to both legal and factual determinations of local jurisdictions with expertise in land use regulation." See City of Medina v. T-Mobile USA, Inc, 123 Wn. App. 19, 24, 95 P.3d 377 (2004). However, no deference is due to the factual determinations of a local jurisdiction in a review for substantial evidence. RCW 36.70C.130(1)(c). Interpretation of a contract based on the plain language of the agreement does not require any local expertise such that deference to local knowledge would be appropriate. Rather,

the objective in interpreting a contract "is to discern the parties' intent," interpreting "clear and unambiguous terms as a question of law." Wm. Dickson Co. v. Pierce County, 128 Wn. App. 488, 493, 116 P.3d 409 (2005). Further, it would be improper to give deference to the City's own interpretation as they are a party to the contract. Finally, as noted by Shelter, the City has offered a variety of interpretations for the same contractual language throughout this litigation and in the City's dealing with Polygon, another developer working to build in the Issaquah Highlands under the same DA that is at issue here.[1] Due to the mercurial position of the City and the various interpretations given to the same language over time, we decline to give deference to its most recent interpretation.

II.    Vesting of SDPs Under the Development Agreement

RCW 36.70B.170(1) authorizes local governments to enter into binding agreements with developers to facilitate the development process. RCW 36.70B.170 Legislative Findings, 1995 ch. 347 § 501. The statute requires that the agreement "set forth the development standards and other provisions that shall apply to and govern and vest the development, use, and mitigation of the development of the real property for the duration specified in the agreement." It also mandates that the "development standards" within these agreements include "a build-out or vesting period for applicable standards." RCW 36.70B.170(3)(i).

In Washington, vesting is the general rule that a complete land use application "will be considered only under the land use statutes and ordinances in

---

[1] Both development agreements were entered into by the City and Grand Ridge LP and Glacier Ridge LP. Westridge-Issaquah II LP v. City of Issaquah, 20 Wn. App. 2d 344, 349, 500 P.3d 157 (2021).

effect at the time of the application's submission." Noble Manor Co. v. Pierce County, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997); See also Seven Hills, LLC v. Chelan County, 198 Wn.2d 371, 388, 495 P.3d 778 (2021). Under the prevailing common law interpretation, developers are "entitled" to have their proposals processed "under the regulations in effect at the time a complete building permit application was filed." Noble Manor, 133 Wn.2d at 275. These principles were codified by the legislature in RCW 19.27.095 (building permits) and 58.17.033 (subdivision and short subdivision applications). The purpose of the doctrine is to provide a degree of certainty to developers and "protect their expectations against fluctuating land use policy," but this must be weighed against the public interest to ensure that the vesting of development rights do not "sanction the creation of a new nonconforming use." Noble Manor, 133 Wn.2d at 278, 280.

Under RCW 36.70B.170(4), DAs are entered into through an exercise of contract authority by local governments, and we apply normal rules of contract interpretation. Washington uses the objective manifestation theory of contracts. Hearst Commc'ns, Inc v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Id. Words in a contract are generally given "their ordinary, usual, and popular meaning unless" the parties clearly intended otherwise. Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 713, 334 P.3d 116 (2014) (quoting Hearst Commc'ns, 154 Wn.2d at 504). "This

meaning may be ascertained by reference to standard English dictionaries." <u>Wm. Dickson Co.</u>, 128 Wn. App. at 493.

The parties disagree about the extent to which the DA provides for the vesting of development rights, the effect of the end of the build-out period, and the effect of the DA's termination. Shelter argues the SDPs vested under the plain language of the DA because they were complete before termination. The City alleges that after the end of the build-out period, the DA governed applications until new regulations were promulgated, "at which point the new regulations would control." Therefore, under the City's theory, any application submitted after the end of the build-out period, but before the DA was terminated, is subject to the new regulations retroactively and the right to develop under the prior regulation did not vest. The hearing examiner concluded that the City's plain language interpretation of the DA was more persuasive.

The first pertinent section of the DA provides for how development within the "Urban Growth Area" (UGA) is carried out. It specifies different types of implementing approvals and provides protection to developers from changes in regulation during the buildout period.

> [Section] 3.23 VESTING OF DEVELOPMENT STANDARDS AND MITIGATION
>
> All development within the [Urban Growth Area] shall be governed by the Development Standards and shall be implemented through plats, short plats, binding site plans, site development permits, building permits and other permits and approvals ("Implementing Approvals") issued by the City. A "Buildout Period" of twenty (20) years following first final plat approval is established for the development and construction of uses for the [Issaquah Highlands] Project. During the Buildout Period, the City shall not modify or impose new or additional Development Standards beyond

those set forth in this Agreement. To the extent this Agreement does not establish Development Standards covering a certain subject, element or condition, then the Project shall be governed by the city codes and standards in effect upon the date of this Agreement . . . .

The second relevant section addresses the post-buildout period.

[Section] 3.23.2 After Buildout.  The Development Standards shall continue to apply to all applications for Implementing Approval submitted after expiration of the Buildout Period, except either party may terminate this Agreement, and the zoning and development regulations may be modified, as provided in Section 5.13.

This then cross-references section 5.13, which addresses the procedure for terminating the agreement and the effect of doing so.

[Section] 5.13 TERM
The term of this Agreement shall continue at a minimum through the Buildout Period, and shall continue after the Buildout Period unless and until either the City or the Partnership . . . gives notice of termination. . . . No sooner than six (6) months after the notice of termination, the City shall hold public hearings and shall adopt zoning and related development standards for the UGA portion of the Property, or portions thereof as determined appropriate by the City. Upon such adoption, this Agreement shall terminate and thereafter the UGA portion of the Property shall be governed by the adopted City zoning and related development regulations.

The City's reading undermines the certainty intended by the legislature and is contrary to the plain language of the DA.  See RCW 36.70B.170. Legislative Findings, 1995 ch. 347 § 501 (Discussing the importance of certainty in efficient development).   First, in Section 3.23 of the DA, "Implementing Approvals" is described as including "plats, short plats, binding site plans, site development permits, building permits and other permits and approvals."  This list expressly captures the SDPs at issue here.  By lumping the various permits together under the same label, the different kinds of permits are interchangeable for the purposes of the DA.  This is crucial because no statute explicitly provides for the vesting of

SDPs, but there are statutes that provide for the vesting of plats, RCW 58.17.033, and building permit applications, RCW 19.27.095. Taken together with RCW 36.70B.170, which allows local governments to stipulate their own standards for vesting in development agreements, the City entered into an agreement where a completed SDP can properly vest.[2]

Second, the end of the build-out period does not bar Shelter from submitting applications nor does it change the standards that apply to those applications according to the language of the DA. Section 3.23.2 states "the Development Standards shall continue to apply to all applications for Implementing Approval submitted after expiration of the Buildout Period." This confirms that vesting is most crucial during the window of time between post-build-out and pretermination because the standards could potentially change. Third, there is merely the possibility for change after the build-out period ends. Section 5.13 reads "[t]he term of this Agreement shall continue at a minimum through the Buildout Period, and shall continue after the Buildout Period unless and until either the City or the Partnership . . . gives notice of termination."

The relevant regulations change only when (or if) the DA is terminated and new regulations are adopted. Termination begins when either party gives notice. After six months, the City could then promulgate new regulations which govern the

---

[2] In briefing, the City specifically argued that state law does not recognize any vesting protections for SDP applications. However, at oral argument before this court, the City conceded that "parties can contract to the specifics of vesting" and that under RCW 26.70B.170, "parties can craft their own destiny and do what works for them . . . and that's what happened here." Wash. Court of Appeals oral argument, *IHIF Commercial LLC v City of Issaquah*, No. 83011-2-I (July 19, 2022) at TVW (July 19, 2022), at 9 min., 40 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2022071053&startStreamAt=580.

land going forward, "thereafter the UGA portion of the Property shall be governed by the adopted City zoning and related development regulations." Shelter argues both the City and hearing examiner interpret "thereafter" to mean retroactive. The City does not respond to this in briefing and did not provide a definition when asked about its definition of "thereafter" at oral argument.[3] To clarify, thereafter is defined as "after that" or "from then on." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED, 2372 (1961). Pairing a dictionary definition of "thereafter" with a retroactive interpretation of this clause, allowing for the retroactive divestment of formally vested rights, would be contrary to the plain language of the DA. Under this reading new regulations apply only after the notice of termination, the six-month waiting period, and the promulgation of new regulations, and those regulations apply only to applications submitted after promulgation. This smooths the transition from one regulatory framework to another.

This interpretation of the plain language of the DA comports with the general statutory scheme and the current common law.[4] At the broadest level, it protects the certainty that is the underlying motivation of RCW 36.70B.170. Legislative Findings, 1995 ch. 347 § 501. It also protects local flexibility for determinations of completeness and policy reflected by RCW 58.17.033, RCW 19.27.095, and RCW

---

[3] Wash. Court of Appeals oral argument, *IHIF Commercial LLC v City of Issaquah*, No. 83011-2-I (July 19, 2022) at TVW (July 19, 2022), at 14 min., 22 sec., *video recording by* TVW, Washington State's Public Affairs Network,
https://www.tvw.org/watch/?clientID=9375922947&eventID=2022071053&startStreamAt=580.

[4] This interpretation is also consistent with the recent Division I opinion in Westridge. In Westridge, developer Polygon submitted building permit applications to the City of Issaquah after the agreement had been terminated and therefore it was not entitled to vesting protection. 20 Wn. App. 2d. at 358. In contrast, Shelter's SDPs were submitted and accepted during the life of the DA.

36.70B.170. Further, it is consistent with the simple idea that the vesting rights doctrine applies not only to "the right to divide land" and build based on that division, but also "the right to develop or use property under the laws as they exist at the time of application." See Noble Manor 133 Wn.2d at 283; See also Seven Hills, 198 Wn.2d at 388. Thus, we reverse based on the plain language of the DA.

WE CONCUR: